IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

| | | |
|---|---|---|
| HAROLD HILL, | ) | |
| | ) | |
| Plaintiff, | ) | 06 C 6772 |
| | ) | |
| v. | ) | |
| | ) | |
| CITY OF CHICAGO, Present and Former | ) | JUDGE ST. EVE |
| Chicago Police Officers KENNETH | ) | |
| BOUDREAU, JOHN HALLORAN, JAMES O'BRIEN, | ) | |
| JON BURGE, ANDREW CHRISTOPHERSON, | ) | |
| DANIEL McWEENY, MICHEAL KILL, WILLIAM | ) | |
| MOSER, JOHN PALADINO, MICHAEL PORCHORDO,| ) | |
| DANIEL BRANNIGAN, Assistant State's | ) | |
| Attorney MIKE ROGERS, and other | ) | |
| AS-YET-UNKNOWN CHICAGO POLICE OFFICERS, | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | JURY TRIAL DEMANDED |

## AMENDED COMPLAINT

Now comes Plaintiff, HAROLD HILL, by his attorneys, LOEVY & LOEVY, and complaining of CITY OF CHICAGO, KENNETH BOUDREAU, JOHN HALLORAN, JAMES O'BRIEN, JON BURGE, ANDREW CHRISTOPHERSON, DANIEL McWEENY, MICHEAL KILL, WILLIAM MOSER, JOHN PALADINO, MICHAEL PORCHORDO, DANIEL BRANNIGAN, and other AS-YET-UNKNOWN CHICAGO POLICE OFFICERS (collectively, the "Defendant Officers"), and Assistant State's Attorney MIKE ROGERS, alleges as follows:

### Introduction

1.    In the early 1990s, Plaintiff Harold Hill, then a teenager, was wrongfully charged, convicted, and imprisoned for a rape and murder he did not commit.

2.    More than a decade later, Mr. Hill was exonerated by forensic testing, including DNA evidence.  Having conclusively

established his innocence beyond any question, his wrongful conviction was vacated in 2005 by agreement with the prosecutors.

3. Mr. Hill's wrongful conviction was the direct product of police misconduct. In particular, Mr. Hill was convicted on the basis of his false "confession," secured by means of improper physical coercion during his interrogation.

4. Mr. Hill's false confession was improperly bolstered by false and improperly-coerced confessions from two other witnesses, one of whom was severely mentally disabled, and the other of whom turned out to be locked up in the Cook County Jail at the precise time he was supposedly (according to his and Hill's "confessions") killing the victim with Mr. Hill.

5. All three "confessions" were coerced and false. All three false confessions are contradicted by the recent DNA testing. The State of Illinois has expressly recognized the innocence of the three "confessors," and has since released all of them.

6. Unfortunately, the misconduct which caused Mr. Hill's wrongful conviction was not an isolated incident. To the contrary, Mr. Hill and his co-defendants were victimized by a group of notorious Chicago Police Detectives, led by Defendants Boudreau and Halloran, who engaged in a disturbing succession of similar abuses over a period of years, frequently preying on the young and the mentally-challenged in order to close unsolved cases via abusive methods of interrogations.

7. Because the City of Chicago permitted the Defendant Officers to engage in this outrageous pattern of abuse

2

with total impunity, the City is independently responsible for
the tragedy that has befallen Mr. Hill.

### Jurisdiction and Venue

8.     This action is brought pursuant to 42 U.S.C.
Section 1983 to redress the deprivation under color of law of
Plaintiff's rights as secured by the United States Constitution.

9.     This Court has jurisdiction pursuant to 28 U.S.C.
§§ 1331, 1367.  Venue is proper under 28 U.S.C. § 1391(b).  The
parties reside in this judicial district, and the events giving
rise to the claims asserted herein occurred here as well.

### The Morgan Murder

10.     In the early morning hours of October 14, 1990,
the partially-naked remains of 39 year-old Kathy Morgan were
discovered by Chicago firefighters amidst a fire in an abandoned
building on West Garfield Boulevard.

11.     The victim had been brutally raped, strangled, and
impaled to death on wooden sticks.  The abandoned building had
been set on fire in an apparent attempt to conceal evidence.

### Plaintiff Harold Hill

12.     Mr. Hill was 16 years-old at the time of the
crime.  He did not know Ms. Morgan, nor did he have anything
whatsoever to do with her murder.

13.     After the murder, approximately a year and a half
went by without the perpetrator being apprehended.  During that
time, the case remained open and unsolved.

14.     In March of 1992, Mr. Hill, then 18 years-old, was
arrested on a totally unrelated robbery charge.

3

15. At the police station, the Defendant Officers proceeded to interrogate Mr. Hill about a variety of crimes, including the as-yet-unsolved Morgan murder. Figuring they could "close the book" on that case, the Defendant Officers used physical violence against Mr. Hill, attempting to coerce him into confessing.

16. Also participating in the interrogation was ASA Rogers, who was at the time acting in a capacity akin to an investigating police officer.

17. During the interrogation, Mr. Hill maintained his innocence, explaining that he knew nothing about the murder. The Defendants would not relent, and used physical violence in order to coerce Mr. Hill into making incriminating statements.

18. Notwithstanding his innocence, Mr. Hill eventually succumbed to the violence and gave a court-reported confession, during which he falsely "admitted" that he had participated in the sexual assault and murder of Ms. Morgan.

19. Because Mr. Hill had no actual knowledge of the murder or how it was committed, the confession given by Mr. Hill incorporated the version of the crime furnished to him by his interrogators.

20. Based on information supplied by the Defendants, Mr. Hill's confession implicated two other men, Dan Young and Peter Williams; according to Mr. Hill's false confession, the three of them raped and murdered Ms. Morgan together.

4

## Dan Young

21. A few days after Mr. Hill's false confession implicating Mr. Young, Mr. Young was arrested and interrogated by the Defendants, among others.

22. At the time of this interrogation, Mr. Young was totally illiterate, unable to read or write anything other than his own name. Mr. Young's IQ of 56 was well below the common benchmark for retardation, and his verbal IQ was only ten points above the lowest score possible. According to two psychiatrists and a psychologist who examined him, he was unable to state where the sun rises, describe what a "ship" is, count backwards, or subtract 6 from 10.

23. Notwithstanding his obvious mental deficiencies, Mr. Young was interrogated at length without counsel by the Defendant Officers, as well as Defendant Rogers. In the course of the interrogation, these Defendants kicked and struck Mr. Young in order to induce him to falsely confess and implicate himself and Mr. Hill.

24. Mr. Young was unable to resist the Defendants' abuse, and, fearing additional beatings, he falsely adopted the version of events fed to him by the Defendants, namely, that he, Mr. Hill, and Mr. Williams had all killed Ms. Morgan together.

25. On the basis of the "confessions" of Mr. Hill and Mr. Young, the Defendant Officers proceeded to arrest Mr. Williams, the third individual supposedly involved with them in the murder.

5

## Peter Williams

26.  Mr. Williams, then 19, was subsequently inter-
rogated by Boudreau and other Defendant Officers.  Mr. Williams
was chained with handcuffs to a radiator for hours, and was
forced to urinate on himself by denying him access to a bathroom.

27.  The Defendants proceeded to coerce Mr. Williams to
"confess" by beating him with a blackjack.  To break his will,
one of the Defendant Officers also stuck a pistol in Mr.
Williams' mouth and pulled the trigger.  Though there was
apparently no bullet in the gun, Mr. Williams was understandably
terrified by this tactic.

28.  As a result of all the foregoing, Mr. Williams
succumbed to the Defendant Officers' violence.  His resultant
false confession mirrored that of Mr. Hill and Mr. Young,
likewise indicating that all three of them had raped and then
killed Ms. Morgan together, and it contained even more details
about the crime.

## The "Confessions" Unravel

29.  The Defendant Officers' case against the three men
took a distinct turn for the worse when jail records subsequently
confirmed that Mr. Williams was locked up in the Cook County Jail
at the time the murder took place.  He could not have
participated.

30.  Accordingly, Mr. Williams' "confession" indicating
that he, Mr. Young, and Mr. Hill, had all raped and killed Ms.
Morgan together was an impossibility, and would not have been
procured but for the Defendant Officers illegal tactics.  In Mr.

6

Williams' words, "by the time [the Defendant Officers] were through, I actually thought I did it."

31. Also false were the confessions by Mr. Hill and Mr. Young wherein they supposedly admitted to raping and killing the victim with Mr. Williams.

### Aftermath

32. Because Mr. Williams could not have committed the crime notwithstanding his signed, court-reported confession, he was released without trial.

33. Tragically, however, the State nonetheless proceeded to prosecute Mr. Hill and Mr. Young. Even more tragically, they were convicted.

### The Due Process Violations

34. In order to ensure that Mr. Hill and Mr. Young were convicted, the Defendant Officers not only manufactured false evidence, but also suppressed evidence of their own misconduct, and destroyed documents and other evidence that would have helped Mr. Hill prove his innocence.

35. The withholding of exculpatory information referred to in the foregoing paragraph includes, but is not limited to the Defendants' notes regarding the interrogations of Mr. Hill, Mr. Young, and Mr. Williams, as well as evidence concerning alternative suspects, among other subjects.

36. Defendants further violated Mr. Hill's rights by creating various police reports containing materially false "evidence," *e.g.*, attributing incriminating statements to witnesses who had in fact never made these statements.

7

37.  Defendants also suppressed, or caused to be suppressed, exculpatory evidence relating to fingerprints and/or blood typing, as well as the presence of semen at the crime scene.

### Plaintiff's Wrongful Conviction

38.  Mr. Hill and Mr. Young both contemporaneously alleged that their "confessions" had been coerced, and that they were innocent.  Both attempted to suppress their confessions prior to trial, but said motions were denied.

39.  Following the denial of their motions to suppress, in 1994, Mr. Hill and Mr. Young were tried simultaneously (but to separate juries) for the rape and murder of Kathy Morgan.  Both men testified in their own defense that they had nothing to do with the crime notwithstanding their purported confessions.

40.  As a proximate result of the Defendants' misconduct described above, Mr. Hill was wrongfully convicted, as was Mr. Young.  Both men were sentenced to life in prison.

41.  But for Defendants' above-described misconduct, Mr. Hill would not have been prosecuted, much less convicted. The only evidence linking either him or Mr. Young to this crime was their coerced confessions and the testimony of a forensic dentist named John Kenney, who supposedly specialized in so-called "bite-mark" identification.

42.  In actuality, the bite-mark testimony had no scientific value.  The victim's skin had been burned, rendering teeth-mark comparisons inappropriate because heat and fire

8

distorts human skin. At least two experts have since provided sworn testimony debunking the bite-mark testimony in this case.

43. Moreover, Kenney himself has subsequently admitted publicly that he had been "pushed" by prosecutors into making his testimony more damning. In Kenney's words: "Sometimes you say OK to get them to shut up. . . I allowed myself to be pushed."

44. Mr. Hill was also convicted in part based on the coerced incriminating statement given by Mr. Young, a man who was so vulnerable to manipulation that, when interviewed for his pre-sentence report, he did not even know or understand that he had been convicted by the jury.

## The Exonerations

45. Recent forensic testing conducted in the past two years on all of the physical evidence relating to the Morgan murder excludes Mr. Hill and Mr. Young, as well as Mr. Williams. This includes testing on the DNA material taken from underneath the victim's fingernails, as well as hairs found on the victim's body and at the murder scene.

46. In fact, DNA testing has revealed a unique genetic profile of two other as-yet unidentified men, presumably the real killers. Their DNA was found underneath the victim's fingernails, left there by her attackers as she tried to defend herself.

47. To his credit, faced with this convincing new evidence of innocence, Richard Devine's Office of the Cook County State's Attorney, cooperated with the re-investigation of the case against Mr. Hill and Mr. Young.

9

48. Thereafter, in January of 2005, twelve years after they were sentenced to life in prison, the Cook County prosecutors formally dropped all charges against Mr. Hill and Mr. Young relating to the Morgan murder.

49. Mr. Hill, however, remained in prison on an unrelated robbery sentence for which, admittedly, he was incarcerated during the time period that he was serving his life sentence for the wrongful murder conviction. Mr. Hill has since been released, and is now a free man.

50. Mr. Young previously filed his own lawsuit in the Circuit Court of Cook County arising out of the same set of misconduct. Unfortunately, however, Mr. Young died earlier this year, killed by a car driven by an unknown person in a hit-and-run.

51. Following his release from prison, Plaintiff Hill is now attempting to rebuild his life and clear his name. This lawsuit seeks justice for what the Defendants have done to him.

## The Defendant Officers

52. On information and belief, at the time of the allegations alleged herein, Kenneth Boudreau, along with the other Defendant Officers, were homicide detectives in Area 3, Violent Crimes Division of the Chicago Police Department (the "Department").

53. During the investigation into the Morgan homicide, the Defendant Officers were supervised by Commander Jon Burge, who had previously been transferred to Area 3 from Area 2.

10

54. Over the course of his long career, the Department has bestowed many honors on Detective Boudreau, including commendations and prestigious assignments as rewards for his uncanny success in "solving" murders.

55. Indeed, Boudreau has demonstrated an extraordinary ability to persuade suspects to confess to serious violent crimes. Over and over again, Boudreau's interrogations throughout the years have resulted in people confessing to the crime of murder.

56. Unfortunately, however, Boudreau's methods go far beyond acceptable police interrogation techniques. Indeed, the *Chicago Tribune* examined thousands of murder cases in Cook County from 1991 through 2000, finding that Boudreau and some of the other Defendants had been involved in a wide range of cases that ultimately collapsed even though they had obtained confessions.

57. According to the *Tribune's* survey, however, "Boudreau stands out not only for the number of his cases [with confessions] that have fallen apart, but for the reasons. In those cases, Boudreau has been accused by defendants of punching, slapping or kicking them; interrogating a juvenile without a youth officer present; and of taking advantage of mentally retarded suspects and others with low IQs."

58. In all, Boudreau managed to obtain murder confessions from more than a dozen people in which the charges were either dropped or the defendant was acquitted notwithstanding the supposed confessions.

11

59. For a two-year period in the early 1990s, for example, Boudreau and his partner Halloran helped "solve" at least five murders with "confessions" that ended with acquittals. All of these suspects alleged that Boudreau and/or Halloran mistreated them to obtain false confessions.

60. Some examples of abuses perpetrated by Boudreau and Halloran, often in cooperation with other Defendant Officers, include the following, all of which are corroboratd by sworn testimony:

a. Derrick Flewellen signed a confession coerced by Boudreau after being interrogated for more than 36 hours, during which time he was slapped, kicked, punched, and slammed into the wall by Boudreau and other detectives before succumbing to their coercion. After spending almost five years in prison, Flewellen was acquitted of the two murders when DNA tests proved the crime was committed by someone else.

b. Robert Wilson falsely confessed to slashing a woman with a knife after being slapped and threatened by Defendant Halloran and other Defendant Officers. To seal the case, the Defendant Officers manipulated the victim into identifying Wilson, and then withheld evidence from her that another man, one who exactly fit her description of the perpetrator, had slashed several women in the same area at about the same time. Just last week, Wilson was released from prison, after the victim came forward to blow the whistle on the Defendant Officers' manipulation of her testimony and identify her real attacker, but not before Wilson spent almost ten years

12

wrongfully incarcerated as a result of the Defendant Officers'
misconduct.

c.    Boudreau obtained a murder confession from
Alfonzia Neal, testifying that Neal waived his rights and signed
a statement handwritten by a prosecutor.  Experts established
that Neal had an IQ in the 40s, well below the dividing line for
mental retardation, and that he was incapable of intelligently
waiving his Miranda rights.  Neal was acquitted notwithstanding
his signed confession.

d.    In December 1993, Boudreau and Halloran
solved two separate murders with confessions from two mentally
retarded juveniles, Fred Ewing and Darnell Stokes, classmates in
special-education courses.  One expert concluded that Ewing "was
unable to comprehend the substance of the confession which he
allegedly made."  Absent any other evidence connecting them to
the crime, both were acquitted despite the confessions obtained
by Boudreau and Halloran.

e.    In 1998, Boudreau helped get a murder
confession from a 13-year-old boy with a verbal IQ of 59.  The
judge later ruled that the boy did not have the mental capacity
to waive his rights and threw out the confession.  Prosecutors
then dropped the charges.

f.    After police officer Michael Ceriale was shot
to death in 1998, Boudreau and other detectives arrested Jonathan
Tolliver at 4:00 a.m. and interrogated him for a 24-hour period,
resulting in allegedly incriminating (unwritten and unsigned)
statements.  Tolliver was never advised of his rights, no *Miranda*

13

waiver was created, and his requests to speak with a lawyer and/or his mother were refused. Boudreau claimed that the protections for minors were not utilized because Tolliver, who was 16-year, had lied about his age, falsely claiming to have been eighteen. After two trials, Tolliver was convicted of Ceriale's murder.

g. In connection with the Ceriale murder, Boudreau, among others, coerced statements from other witnesses to incriminate Tolliver. The means of coercion included an intentional withholding of insulin from one diabetic witness for more than 24-hours. When these witnesses later refused to testify at trial consistent with the false statements coerced by Boudreau, the State charged five of them with perjury, and at least one of them went to jail for it.

h. Marcus Wiggins brought a lawsuit against Boudreau (as well as Boudreau's boss, Jon Burge) alleging that he was handcuffed to a wall and beaten in an interrogation room while being questioned with a group of youngsters in a 1991 murder case. Wiggins' mother had been denied access to her son, who was a 13-year old 8th grader at time of the coerced confession. Six young suspects gave confessions. Two of these confessions were later thrown out on the basis of the "periodic screaming [at the police station] throughout the night," screaming that Boudreau testified he did not hear. The remaining four were acquitted, including two who had been interrogated by Boudreau.

14

i.     Antoine Word was placed in an interrogation room by Boudreau and Halloran, where he was cuffed to a bench for prolonged periods, unable to use the bathroom (he urinated on the floor), and beaten.  Boudreau told Word that other witnesses had placed him at the scene, but that he would let him go home and help him if he signed a statement saying that he gave another man a gun.  After almost 48-hours in the room, Word signed the statement written out by Boudreau, and was convicted of murder.

j.     Fabian Pico was 16-years old when he gave a self-incriminating statement to Boudreau and Halloran which was then used to convict him of murder.  When Pico moved to suppress the statement on the grounds that the police did not allow him access to his mother, Boudreau claimed that he had tried unsuccessfully to reach Pico's mother by phone before Pico confessed, but this supposed attempted contact is not referenced anywhere in his written reports.

k.     After being beaten, Jesse Clemon signed a written statement with his left hand (because his right hand had been injured).  Witnesses in the station heard hollering and protests of "I didn't do it."  Boudreau testified that the statement was not coerced, but the judge suppressed it anyway due to the "horrendously oppressive" atmosphere at the station.

l.     Kilroy Watkins was arrested and handcuffed to a metal ring in an interrogation room by Boudreau and Halloran, who then choked and punched him in order to get him to confess to a six-month old shooting.  After more than 30 hours in this room

15

with minimal sleep and food, Watkins signed an incriminating statement.

m.    In 1992, Clayborn Smith was interrogated for 37 hours about a murder he knew nothing about. When Mr. Smith professed his innocence, Halloran kicked and punched his head and body, and Boudreau threatened to charge Mr. Smith's pregnant girlfriend if he did not confess. At one point, the Defendants believed that they had successfully coerced Mr. Smith to confess, but when the Assistant State's Attorney ("ASA") entered the room, Mr. Smith continued to assert his innocence, whereupon the ASA left and the beating resumed. The same thing happened a second time, this time with ASA Lambur, the same ASA involved in Mr. Hill's case, but again Mr. Smith refused to confess. When Lambur left the room, Boudreau and Halloran resumed the beating, whereupon Mr. Smith, deprived of both counsel and sleep for an inordinate time, finally signed a false confession.

n.    Christopher Holly filed a federal civil rights lawsuit against Boudreau and other detectives alleging that he was framed for a murder in 1998.

o.    Richard Malek alleges that Boudreau and other detectives kept him in an interrogation room for four days, depriving him of sleep, food, and access to lawyers, as well as using violence (they knocked out his tooth) and threats to shoot him (Russian Roulette) in an attempt to coerce his confession. Boudreau participated in this coercion, but played the "good cop," uncuffing Mr. Malek and providing him with a McDonalds hamburger after he had been starved for an extended period. When

16

they falsely claimed to have obtained an "oral" confession, Mr. Malek filed a federal lawsuit against Boudreau and others.

p.     In 1995, Detectives Halloran and Boudreau interrogated and coerced confessions from Oscar Gomez, Eric Gomez, and Abel Quinoles. Their tactics included holding all three men for 30 hours, beating them while they were shackled to the wall, and preventing them from communicating with an attorney or their families, all in a successful attempt to coerce false confessions. All three defendants were found not guilty, based largely on the conclusion that Detectives Halloran and Boudreau physically coerced their confessions.

q.     In 1993, the day after Tyrone Reyna's sixteenth birthday, he was beaten during interrogation by Halloran and Boudreau, who refused to let him contact his family, and intimidated him into confessing to a murder he did not commit.

r.     Tyrone Reyna's co-defendants, Nicholas Escamilla and Miguel Morales were arrested by Boudreau and Halloran for murder despite the lack of any physical evidence or eye witnesses linking Escamilla to the crime. Boudreau and Halloran tortured Escamilla by beating him and threatening to send his pregnant wife to jail if he did not confess. After many hours of abuse, Escamilla eventually falsely confessed as well.

s.     Similarly, Miguel Morales was beaten by Halloran during his interrogation. However, unlike Escamilla, Morales refused to confess. Halloran and Boudreau thus coerced a friend of Morales into stating that Morales had confessed to the

17

murder over the phone. The witness recanted his statement at trial, and testified that he only gave the statement after he had been beaten for over twenty hours and threatened with prosecution until he falsely implicated Morales.

t.    In 1998, Boudreau and Halloran held Joseph Jackson in an interrogation room in connection with a murder. When Jackson refused to confess, Boudreau placed a book on his chest and stomach and hit the book with a black jack, so as not to leave visible marks on Jackson's body. Meanwhile, Halloran, using a torture technique referred to in the Department as "bagging," placed a typewriter cover over Jackson's head and cut off his air supply. As a result of this coercion, Jackson eventually confessed to a murder he did not commit.

u.    In 1991, fifteen year-old John Plummer was interrogated for 36 hours by Detectives Boudreau and Halloran. After being physically beaten, he falsely confessed to a murder.

v.    In 1992, Arnold Day was interrogated in connection with a murder investigation. Mr. Day was isolated in an interrogation room for many hours while Detective Boudreau psychologically and physically tortured him until he finally confessed.

w.    In 1993, Richard Anthony was forced to confess to murder by Detective Halloran, who beat Anthony and denied him food, sleep, and use of the restroom in order to coerce Anthony into giving a false statement.

x.    Richard Anthony's co-Defendant, Jerry Gillespie, was also beaten by Boudreau and Halloran during his 30

18

hour interrogation, which included preventing him from contacting an attorney or his family and refusing to allow him to use the bathroom. As a result of the abuse, coercion and intimidation, Gillespie eventually gave a false confession.

y.     In 1995, Boudreau and Halloran were part of a team of detectives who physically abused John Wright until he agreed to implicate Malik Taylor and Michael Taylor in connection with a murder.

z.     In 1993, Emmett White was arrested by Boudreau, and O'Brien, who subsequently hit him in the face, punched him in the body, threw him to the ground and stepped on his face, dragging his head across the floor of the interrogation room, all in an attempt to get him to falsely confess. Photographs of Mr. White corroborated his testimony of his abuse.

61.    The above-described documented allegations constitute only a fraction of the cases where Boudreau and/or Halloran have engaged in unlawfully coercive tactics. This is because many, if not most, criminal defendants seeking to suppress confessions are ultimately unable to identify the particular detectives who committed the acts, as defendants are often interrogated by detectives working in rotations, all dressed in street clothes without nameplates.

62.    Thus, for every documented case of coercion, Boudreau and Halloran have gotten away with many other similar abuses which were never brought to light or justice.

63.    Moreover, this list of accusers fails to include those many cases where the attempted coercion ultimately failed.

19

Wherever no incriminating statement was actually obtained, Boudreau and his colleagues eventually had to release people; without any resulting statement, the instances of coercive tactics are rarely documented or otherwise visible to the public to compile. Even where victims took the inevitably-futile step of complaining to the Department's Office of Professional Standards, all such documents have since been destroyed per the City's agreement with the police union.

64. For these reasons, the above-described list of abuses represents only a small proportion of the cases where people were victimized by Boudreau and Halloran's consistent *modus operendi* of coercing confessions.

## The Department's Response

65. Due to the publicity associated with the aforementioned *Chicago Tribune* investigation and its conclusion that "Boudreau stands out not only for the number of his cases [with confessions] that have fallen apart, but for the reasons," the Department has reassigned Boudreau from the Detective Division to a federal task force.

66. However, despite the mountain of evidence corroborating their coercive interrogation tactics, Detectives Boudreau and Halloran not only remain employed by the Police Department of the City of Chicago, but they also have not been subjected to any genuine investigation, discipline or punishment.

67. Once, the Department did try to suspend Boudreau for excluding a youth officer from his interrogation of a juvenile in a case that eventually drew headlines about police

20

abuse when multiple confessions were thrown out and charges were dropped. Boudreau's superior officers, however, reduced his punishment to a meaningless reprimand.

68. In this way, Boudreau and the other Defendant Officers were led to believe by their employer, the City of Chicago, that the only thing that mattered on their watch was obtaining confessions, regardless of whether the supposed confessors were actually innocent or guilty.

69. Likewise, the Cook County State's Attorney's Office, has announced publicly that it would be too time-consuming to re-examine Boudreau's prior cases, and the Office is therefore unwilling to do so.

## Supervisory Liability

70. In 1988, Defendant Burge was transferred to Area 3, where he was assigned as the Commander.

71. As Commander, Burge was the direct supervisor of most or all of the other Defendant Officers from 1988 until the Fall of 1991, when Burge was suspended from duty and ultimately fired for his torture of numerous African-American men and boys.

72. Defendant Burge directly supervised the investigation into the Morgan homicide until his suspension in Fall 1991.

73. From 1988 until his suspension, Defendant Burge taught and directed his subordinate officers, including most or all of the Defendant Officers, to use physical torture and other methods of improper coercion experienced by Mr. Hill against Area 3 arrestees.

74. In so doing, Defendant Burge created an express policy and widespread practice within Area 3 of using torture and other improper methods of coercion to garner confessions from arrestees.

75. The misconduct perpetrated against Mr. Hill during his interrogation (as well as the other victims mentioned in the foregoing paragraphs of this Amended Complaint) was carried out pursuant to the policy and widespread practice instituted by Defendant Burge in Area 3.

76. Absent knowing participation and/or approval by the command personnel responsible for supervising the Defendant Officers, the misconduct alleged in this Complaint could not have occurred.

### Chicago's "Street Files" Practice

77. The unconstitutional withholding of exculpatory information from Mr. Hill's defense in this case, as well as the subsequent destruction of portions of the same, was all undertaken pursuant to, and proximately caused by, a policy and practice on the part of the Chicago Police Department.

78. Specifically, at all times relevant hereto, members of the Chicago Police Department, including the Defendants in this action, systematically suppressed Brady material by intentionally secreting discoverable information in so-called "street files." As a matter of widespread custom and practice, these clandestine street files were routinely withheld from the State's Attorney's Office and from criminal defendants, and were subsequently destroyed.

22

79. Consistent with the municipal policy and practice described in the preceding paragraphs, Defendants in this case concealed exculpatory evidence within street files which were never disclosed to Mr. Hill's criminal defense team and which have since been destroyed. This withholding and destruction of evidence which would have exonerated Mr. Hill was undertaken pursuant to the City's policy and practice in the manner described above.

80. The street files practice described in the foregoing paragraph was consciously approved at the highest policy-making level for decisions involving the police department, and was a proximate cause of the injuries suffered here by the Plaintiff.

81. The street files practice described in the foregoing paragraphs was enjoined by court order and supposedly discontinued prior to the investigation of the Morgan murder. Contrary to the Department's public pronouncements, however, the street files practice continued through and including the Morgan investigation, directly causing a violation of Mr. Hill's rights.

82. All of the actions taken by the individual Defendants in connection with the investigation of the Morgan murder were undertaken under color of law and in the scope of their employment.

**Additional Suppression of Evidence**

83. During the pendency of Mr. Hill's post-conviction petition, two or more Defendant Officers, including but not

23

limited to Defendants Pochordo and Brannigan, concealed physical evidence known to them to be exculpatory.

84. As a result of these Defendants' misconduct, Mr. Hill was deprived of material, exculpatory evidence.

## Count I

### Due Process

85. Each of the Paragraphs of this Complaint is incorporated as if restated fully herein.

86. As described more fully above, all of the Defendants, while acting individually, jointly, and in conspiracy, as well as under color of law and within the scope of their employment, deprived Plaintiff of his constitutional right to a fair trial.

87. In the manner described more fully above, the Defendants deliberately withheld exculpatory evidence, as well as fabricated false reports and other evidence, thereby misleading and misdirecting the criminal prosecution of Plaintiff. Absent this misconduct, the prosecution of Plaintiff could not and would not have been pursued.

88. The Defendant Officers' misconduct also directly resulted in the unjust criminal conviction of Plaintiff, thereby denying him his constitutional right to a fair trial, a fair appeal thereof, and fair post-conviction proceedings, all in violation of the Due Process Clause of the Fourteenth Amendment to the United States Constitution.

89. As a result of this violation of his constitutional right to a fair trial, Plaintiff suffered

24

injuries, including, but not limited to, emotional distress, as is more fully alleged above.

90. The misconduct described in this Count was objectively unreasonable and was undertaken intentionally with willful indifference to Plaintiff's constitutional rights.

91. The misconduct described in this Count was undertaken pursuant to the policy and practice of the Chicago Police Department in that Mr. Hill was the victim of, and his injuries were proximately caused by, a policy and practice on the part of the City of Chicago to pursue and secure false convictions through profoundly flawed investigations.

92. Specifically, throughout the 1980s and early 1990s, and continuing thereafter, a group of Chicago Police Officers in Areas 2 and 3, including some or all of the Defendants herein, engaged in a systematic pattern of coercion, fabrication of evidence, withholding of exculpatory information, and other illegal tactics, the sum total of which completely corrupted the investigative process.

93. This institutional desire to close cases through abusive tactics regardless of actual guilt or innocence, in order to enhance police officers' personal standing in the Department, was known to the command personnel, who themselves participated in the practice.

94. The above-described widespread practices, so well-settled as to constitute *de facto* policy in the Chicago Police Department during the time period at issue, was able to exist and

25

thrive because municipal policymakers with authority over the same exhibited deliberate indifference to the problem.

95. The widespread practices described in the preceding paragraphs were allowed to take place because the City declined to implement sufficient training and/or any legitimate mechanism for oversight or punishment. Indeed, the Department's system for investigating and disciplining police officers accused of the type of misconduct which befell Plaintiff was, and is, for all practical purposes, nonexistent.

96. Chicago police officers who manufactured criminal cases against individuals such as Plaintiff had every reason to know that they not only enjoyed *de facto* immunity from criminal prosecution and/or Departmental discipline, but that they also stood to be rewarded for closing cases no matter what the costs. In this way, this system proximately caused abuses, such as the misconduct at issue in this case.

### Count II

### False Imprisonment

97. Each of the Paragraphs of this Complaint is incorporated as if restated fully herein.

98. As described more fully above, all of the Defendants, while acting individually, jointly, and in conspiracy, as well as under color of law and within the scope of their employment, caused Plaintiff to be falsely imprisoned in violation of his constitutional rights.

26

99. As a result of this violation, Plaintiff suffered injuries, including but not limited to emotional distress, as is more fully alleged above.

100. The misconduct described in this Count was objectively unreasonable and was undertaken intentionally with willful indifference to Plaintiff's constitutional rights.

101. The misconduct described in this Count was undertaken pursuant to the policy and practice of the Chicago Police Department in the manner described more fully above.

### Count III

### Coerced Confession -- Fourteenth Amendment

102. Each of the Paragraphs of this Complaint is incorporated as if restated fully herein.

103. As more fully described above, one or more of the Defendants used unjustified violence against Plaintiff in an attempt to coerce him to confess to a crime he did not commit.

104. As a result of Defendants' unjustified use of force, Plaintiff suffered great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other consequential damages.

105. The misconduct described in this Count was undertaken with malice, willfulness, and reckless indifference to the rights of others such that the Defendants' actions shock the conscience.

106. The misconduct described in this Count was also undertaken pursuant to the policy and practice of the Chicago Police Department in the manner described more fully above.

### Count IV

### Coerced Confession -- Fifth Amendment

107. Each of the Paragraphs of this Complaint is incorporated as if restated fully herein.

108. As more fully described above, one or more of the Defendants used unjustified violence against Plaintiff in an attempt to coerce him to confess to a crime he did not commit.

109. Plaintiff, who was not provided any *Miranda* warnings, was denied access to legal counsel for the duration of his interrogation, notwithstanding requests for the same. As a result of this and the other misconduct described in this Complaint, Plaintiff was forced to incriminate himself falsely against his will.

110. Plaintiff's coerced false statements were used against Plaintiff in a criminal case to his detriment.

111. As a result of Defendants' misconduct, Plaintiff suffered great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other consequential damages, as well as loss of liberty.

112. The misconduct described in this Count was undertaken with malice, willfulness, and reckless indifference to the rights of others such that the Defendants' actions shock the conscience.

113. The misconduct described in this Count was also undertaken pursuant to the policy and practice of the Chicago Police Department in the manner described more fully above.

28

## Count V

### 6th Amendment

114. Each of the Paragraphs of this Complaint is incorporated as if restated fully herein.

115. As described more fully above, one or more of the Defendants, all while acting individually, jointly, and in conspiracy, as well as under color of law and within the scope of their employment, denied Plaintiff his right to counsel in violation of his constitutional rights.

116. As a result of these violations, Plaintiff suffered injuries, including but not limited to emotional distress, as is more fully alleged above.

117. The misconduct described in this Count was objectively unreasonable and was undertaken intentionally with willful indifference to Plaintiff's constitutional rights.

118. The misconduct described in this Count was undertaken pursuant to the policy and practice of the Chicago Police Department in the manner described more fully above.

### Count VI

### Equal Protection

119. Each of the Paragraphs of this Complaint is incorporated as if restated fully herein.

120. As described more fully above, Defendants, all while acting individually, jointly, and in conspiracy, as well as under color of law and within the scope of their employment, denied Plaintiff equal protection of the law in violation of his constitutional rights.

29

121. Specifically, these Defendants actively participated in, or personally caused, misconduct in terms of abusing minority criminal suspects in a manner calculated to coerce confessions and secure unjust convictions. Said misconduct was motivated by racial animus and constituted purposeful discrimination; it also affected minorities in a grossly disproportionate manner vis-a-vis similarly-situated Caucasian individuals.

122. As a result of this violation, Plaintiff suffered injuries, including but not limited to emotional distress, as is more fully alleged above.

123. The misconduct described in this Count was objectively unreasonable and was undertaken intentionally with willful indifference to Plaintiff's constitutional rights.

124. The misconduct described in this Count was undertaken pursuant to the policy and practice of the Chicago Police Department in the manner described more fully above.

### Count VII

### Section 1985 Conspiracy to Deprive Constitutional Rights

125. Each of the Paragraphs of this Complaint is incorporated as if restated fully herein.

126. As described more fully above, each of the Defendants conspired, directly or indirectly, for the purpose of depriving Plaintiff of Equal Protection of the law.

127. In so doing, Defendants took actions in furtherance of this conspiracy, causing injury to Plaintiff.

30

128. The misconduct described in this Count was undertaken with malice, willfulness, and reckless indifference to the rights of others.

129. The misconduct described in this Count was undertaken pursuant to the policy and practice of the Chicago Police Department in the manner described more fully above.

## Count VIII

### Section 1983 Conspiracy to Deprive Constitutional Rights

130. Each of the Paragraphs of this Complaint is incorporated as if restated fully herein.

131. After the Morgan murder, the Defendants reached an agreement amongst themselves to frame Plaintiff for the crime, and to thereby deprive Plaintiff of his constitutional rights, all as described in the various Paragraphs of this Complaint.

132. Independently, before and after Plaintiff's convictions, each of the Defendants further conspired, and continue to conspire, to deprive Plaintiff of exculpatory materials to which he was lawfully entitled and which would have led to his more timely exoneration of the false charges as described in the various Paragraphs of this Complaint.

133. In this manner, the Defendant Officers, acting in concert with other unknown co-conspirators, including persons who are not members of the Chicago Police Department, have conspired by concerted action to accomplish an unlawful purpose by an unlawful means.

31

134. In furtherance of the conspiracy, each of the co-conspirators committed overt acts and was an otherwise willful participant in joint activity.

135. As a direct and proximate result of the illicit prior agreement referenced above, Plaintiff's rights were violated, and he suffered financial damages, as well as severe emotional distress and anguish, as is more fully alleged above.

136. The misconduct described in this Count was undertaken with malice, willfulness, and reckless indifference to the rights of others.

137. The misconduct described in this Count was undertaken pursuant to the policy and practice of the Chicago Police Department in the manner described more fully in preceding paragraphs, and was tacitly ratified by policy-makers for the City of Chicago with final policymaking authority.

### Count IX

### Denial of Access to Courts

138. Each of the Paragraphs of this Complaint is incorporated as if restated fully herein.

139. In the manner described more fully herein, each of the Defendants, all while acting individually, jointly, and in conspiracy, denied Plaintiff the right to access to courts by their wrongful suppression and destruction of information and evidence which deprived Plaintiff of constitutional claims against potential Defendants.

140. Other claims were diminished by the passage of years, and the accompanying erosion of evidence necessary to prove these claims against those Defendants.

141. The misconduct described in this Count was undertaken with malice, willfulness, and reckless indifference to the rights of others.

142. The misconduct described in this Count was undertaken pursuant to the policy and practice of the Chicago Police Department in the manner described more fully in preceding paragraphs.

## Count X

### Failure to Intervene

143. Each of the Paragraphs of this Complaint is incorporated as if restated fully herein.

144. In the manner described above, during the constitutional violations described above, one or more of the Defendants (and other as-yet-unknown Chicago Police Officers) stood by without intervening to prevent the misconduct.

145. As a result of the Defendant Officers' failure to intervene to prevent the violation of Plaintiff's constitutional rights, Plaintiff suffered pain and injury, as well as emotional distress. These Defendants had a reasonable opportunity to prevent this harm, but failed to do so.

146. The misconduct described in this Count was objectively unreasonable and was undertaken intentionally with willful indifference to Plaintiff's constitutional rights.

33

147. The misconduct described in this Count was undertaken pursuant to Chicago's policy and practice in the manner described in preceding paragraphs.

## Count XI

### Conditions of Confinement

148. Each of the Paragraphs of this Complaint is incorporated as if restated fully herein.

149. In attempting unlawfully to coerce Plaintiff to confess to a murder he did not commit, the Defendants employed unlawful methods, such as shackling Plaintiff's wrist to the wall for excessive amounts of hours and intentionally depriving Plaintiff of rest.

150. The misconduct described in this Count was undertaken with malice, willfulness, and reckless indifference to the rights of others.

151. As a result of this misconduct, Plaintiff sustained physical and emotional injuries.

152. The misconduct described in this Count was undertaken pursuant to the policy and practice of the Chicago Police Department in the manner described more fully above.

WHEREFORE, Plaintiff, HAROLD HILL, respectfully requests that this Court enter judgment in his favor and against Defendants, CITY OF CHICAGO, KENNETH BOUDREAU, JOHN HALLORAN, JAMES O'BRIEN, JON BURGE, ANDREW CHRISTOPHERSON, DANIEL McWEENY, MICHEAL KILL, WILLIAM MOSER, JOHN PALADINO, MICHAEL PORCHORDO, DANIEL BRANNIGAN, MIKE ROGERS, and other AS-YET-UNKNOWN CHICAGO

34

POLICE OFFICERS, awarding compensatory damages, costs, and attorneys' fees, along with punitive damages against each of the individual Defendants in their individual capacities, as well as any other relief this Court deems just and appropriate.

### JURY DEMAND

Plaintiff, HAROLD HILL, hereby demands a trial by jury pursuant to Federal Rule of Civil Procedure 38(b) on all issues so triable.

RESPECTFULLY SUBMITTED:

_s/Russell Ainsworth_
Attorneys for Harold Hill

Arthur Loevy
Jon Loevy
Michael Kanovitz
Russell Ainsworth
LOEVY & LOEVY
312 North May Street
Suite 100
Chicago, IL 60607
(312) 243-5900

**CERTIFICATE OF SERVICE**

        I, Russell Ainsworth, an attorney, certify that on January 30, 2007, I delivered by electronic means a copy of the attached Amended Complaint to all counsel of record.

<u>    s/Russell Ainsworth   </u>