IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

| | | | |
|---|---|---|---|
| HAROLD HILL, | ) | | |
| | ) | | |
| Plaintiff, | ) | | |
| | ) | | |
| v. | ) | 06 C 6772 | |
| | ) | | |
| CITY OF CHICAGO, et al., | ) | | |
| | ) | JUDGE ST. EVE | |
| | ) | | |
| Defendants. | ) | JURY TRIAL DEMANDED | |

**Plaintiff's Response to Defendants Boudreau and Halloran's
<u>Motion *in Limine* to Bar Evidence of Ten Other Acts</u>**

**Table Of Contents**

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Legal Standard . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

I.     The Proposed Other Acts Evidence Is Directed Toward Establishing
A Matter In Issue Other Than Propensity . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

        A.    *Modus Operandi* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

        B.    Intent . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

II.    The Other Acts Are Similar Enough And Close Enough In Time
To Be Relevant To The Matter In Issue . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

        A.    Similarity Of The Other Acts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

                1. Kilroy Watkins . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

                2. Oscar Gomez . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

                3. Tyrone Reyna . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

                4. Clayborn Smith . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

                5. Abel Quinones . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

                6. Arnold Day . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

                7. Enrique Valdez . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

                8. Derrick Flewellen . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

                9. Robert Wilson . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

                10. Curtis Milsap . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

        B.    The Other Acts Are Close Enough In Time . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

III.   The Evidence Is Sufficient To Support A Jury Finding That
Defendants Committed The Similar Acts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

IV.    The Probative Value Of The Evidence Is Not Substantially
       Outweighed By The Danger Of Unfair Prejudice . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

## Table of Authorities

Cases                                                              Page(s)

*Akbar v. City of Chicago*, No. 06 C 33685, 2009 WL 3335364 (N.D. Ill. Oct. 14, 2009) . . . 6, 10

*Alexander v. City of Milwaukee*, 474 F.3d 437 (7th Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . 6

*Carson v. Polley*, 689 F.2d 562 (5th Cir. 1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Edwards v. Thomas*, 31 F. Supp. 2d 1069 (N.D. Ill. 1999) . . . . . . . . . . . . . . . . . . . . . . . . passim

*Estate of Moreland v. Dieter*, 395 F.3d 747 (7th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Finley v. Lindsay,* No. 97 C 7623, 1999 WL 608706 (N.D. Ill. Aug. 5, 1999) . . . . . . . . . . . . . 9

*Gonzalez v. City of Elgin*, 2010 WL 3271272 (N.D. Ill. Aug. 16, 2010) . . . . . . . . . . . . . . . . . . 11

*Gonzalez v. City of Elgin*, 2010 WL 3306917 (N.D. Ill. Aug. 19, 2010) . . . . . . . . . . . . . . . 6, 26

*Hawthorne Partners v. AT&T Techs.*, Inc., 831 F. Supp. 1398 (N.D. Ill. 1993) . . . . . . . . . . . . . 2

*Hopson v. Frederickson*, 961 F.2d 1374 (8th Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Hudson v. District of Columbia*, 558 F.3d 526 (D.C. Cir. 2009) . . . . . . . . . . . . . . . . . . . . . 15, 21

*Motherway, Glenn & Napleton v. Tehin*, 2003 WL 21501952 (N.D. Ill. June 26, 2003) . . . . . . 7

*Newsome v. James*, 2000 WL 104822 (N.D. Ill. June 27, 2007) . . . . . . . . . . . . . . . . . . . . . . 4, 21

*Okai v. Verfuth*, 275 F.3d 606 (7th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*Petrovic v. City of Chicago*, 2008 WL 818309 (N.D. Ill. Mar. 21, 2008) . . . . . . . . . . . . . . passim

*State Farm v. Campbell*, 538 U.S. 408 (2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Treece v. Hochstetler*, 213 F.3d 360 (7th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

*United States Gypsum Co. v. Lafarge No. Am. Inc.*, 2009 WL 3871823 (N.D. Ill. 2009) . . . . . . . 6

*United States v. Brooks*, 125 F.3d 484 (7th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*United States v. Brown*, 31 F.3d 484 (7th Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*United States v. Conley*, 291 F.3d 464 (7th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 5

*United States v. Denburg*, 212 F. 3d 987 (7th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*United States v. Fountain*, 768 F.2d 790 (7th Cir. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*United States v. Green*, 258 F.3d 683 (7th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*United States v. Gruttadauro*, 818 F.2d 1323 (7th Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . . . 7

*United States v. Harris*, 587 F.3d 861 (7th Cir. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*United States v. Hernandez*, 84 F.3d 931 (7th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*United States v. Hudson*, 884 F.2d 1016 (7th Cir. 1989) . . . . . . . . . . . . . . . . . . . . . . . . 9, 10, 21

*United States v. Kieffer*, 68 Fed. Appx. 726 (7th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . 5

*United States v. Lloyd*, 71 F.3d 1256 (7th Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*United States v. Macedo*, 406 F.3d 778 (7th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*United States v. Mounts*, 35 F.3d 1208 (7th Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*United States v. Radseck*, 718 F.2d 233 (7th Cir. 1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*United States v. Robinson*, 161 F.3d 463 (7th Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 10

*United States v. Ross*, 510 F.2d 702 (7th Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*United States v. Senak*, 527 F.2d 129 (7th Cir. 1975) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*United States v. Simpson*, 479 F.3d 492 (7th Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*United States v. Wimberly*, 60 F.3d 281 (7th Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*United States v. York*, 933 F.2d 1343 (7th Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 27

*United States v. Zapata*, 871 F.2d 616 (7th Cir. 1989) . . . . . . . . . . . . . . . . . . . . . . . . 3, 5, 9, 29

*Williams v. ConAgra Poultry Co.*, 378 F.3d 790 (8th Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . 7

*Wilson v. City of Chicago,* 6 F.3d 1233 (7th Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

*Wilson v. Williams*, 182 F.3d 562 (7th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Young v. Rabideau*, 821 F.2d 373 (7th Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

<u>Other Authorities</u>

Fed. R. Evid. 404(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

NOW COMES Plaintiff, HAROLD HILL, by his counsel, LOEVY & LOEVY, and respectfully opposes Defendants Boudreau and Halloran's Motion *in Limine* to Bar Evidence of Ten Other Acts as follows:

## INTRODUCTION

Plaintiff seeks to present trial testimony about Defendants Boudreau and Halloran's methods for obtaining false confessions through physical and psychological coercion in murder cases, methods that repeated themselves with disturbing and unvarying regularity. This testimony is relevant and admissible under Rule 404(b) to show that Defendants Boudreau and Halloran ("Defendants") intended to use physical violence and psychological coercion to elicit Plaintiff's confession to the rape and murder of Kathy Morgan. It is also relevant and admissible under Rule 404(b) to show that Defendants had a *modus operandi* of using physically and psychologically coercive tactics during interrogations to force young, black or Latino men into telling them the statements that the Defendants wanted to hear.

## ARGUMENT

### Legal Standard

Evidence may be excluded *in limine* only where it is clearly inadmissible for any purpose. *Hawthorne Partners v. AT&T Techs., Inc.*, 831 F. Supp. 1398, 1400 (N.D. Ill. 1993). The better course of action is to decide questions of the admissibility of evidence at trial, where issues concerning foundation, relevance, and prejudice can be addressed and resolved in the proper context, without the risk of inappropriate pretrial exclusion of properly admissible evidence. *Petrovic v. City of Chicago*, 2008 WL 818309, at *1 (N.D. Ill. Mar. 21, 2008).

Under Rule 404(b), "evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith." Fed. R. Evid. 404(b).

However, it may, be admissible "for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." *Id.* The categories that appear in the text of Rule 404(b) are not exclusive. *United States v. Robinson*, 161 F.3d 463, 466-67 (7th Cir. 1998). "Indeed, Rule 404(b) does not require the party offering the evidence to force the evidence into a particular listed category, but simply to show *any* relevant purpose other than proving conduct by means of a general propensity inference." *Id.*

Evidence is admissible where: (1) it is directed towards establishing a matter in issue other than the defendant's propensity to commit a crime, (2) it shows that the other acts is similar enough and close enough in time to be relevant to the matter in issue, (3) it is sufficient to support a jury finding that defendant committed the similar act, and (4) the probative value of the evidence is not substantially outweighed by the danger of unfair prejudice. *Treece v. Hochstetler*, 213 F.3d 360, 363 (7th Cir. 2000); *United States v. Zapata*, 871 F.2d 616, 620 (7th Cir. 1989). Plaintiff's proposed testimony satisfies this four-part test.

## I.     The Proposed Other Acts Evidence Is Directed Toward Establishing A Matter In Issue Other Than Propensity

The manner in which Defendants conducted their interrogations in murder investigations is relevant not only to establishing their *modus operandi* and intent, but also knowledge and plan, all of which are relevant issues in this case. *See, e.g.*, *Wilson v. City of Chicago*, 6 F.3d 1233, 1238 (7th Cir. 1993) (where plaintiff claimed he was tortured into giving a confession, evidence that the same officers had tortured two other suspects was held admissible to show intent, opportunity, preparation, and plan); *United States v. Conley*, 291 F.3d 464 (7th Cir. 2002) (in a gun possession case, two photographs showing the defendant holding other guns on other occasions were admissible to show that the defendant had "the power and intention" to possess

3

the gun at issue in the case); *United States v. Green*, 258 F.3d 683, 694 (7th Cir. 2001)

(defendant need not put intent into play in order for intent to become a Rule 404(b) issue);

*Edwards v. Thomas*, 31 F. Supp. 2d 1069, 1074-75 (N.D. Ill. 1999) (evidence of prior sustained

citizen complaint against defendant police officer concerning the use of excessive force is

admissible to establish defendant's intent to use excessive force against plaintiff); *United States*

*v. Senak*, 527 F.2d 129, 143-45 (7th Cir. 1975) (evidence that defendant attorney had previously

attempted to coerce large fees from a private client was admissible to show defendant's intent to

extort money from indigent clients the government paid him to defend).

### A.    *Modus Operandi*

Evidence of Defendants' interrogation methods is relevant because they are expected to

testify that they have never coerced suspects to confess, never used physical force on any

suspects, and that their customary interrogation technique is simply to ask questions and receive

voluntary answers. In other words, Defendants claim that in this case, as in all others, they

followed their specific protocols for securing confessions from criminal suspects, and that this

protocol did not involve coercion. With this testimony, the manner in which Defendants practice

their detective work, their knowledge and intent during their investigation of the Morgan murder,

and their *modus operandi* for obtaining confessions or statements from suspects are all put

directly in play. Plaintiff's Rule 404(b) evidence goes to a matter in issue because it is being

offered to rebut the defense that Defendants' specific method of obtaining confessions did not

involve coercion.

Defendants nevertheless insist that there are no Rule 404(b) issues in this case. For

instance, Defendants rely on *Newsome v. James*, 2000 WL 104822 (N.D. Ill. June 27, 2007), for

the proposition that *modus operandi* evidence is admissible only in cases where identity is an

issue. But this particular decision notwithstanding, this is simply not the law. There is ample case law in this Circuit allowing Rule 404(b) evidence to establish *modus operandi* even in cases where identity is not an issue. *See, e.g.*, *Zapata*, 871 F.2d at 620 (in a drug conspiracy case, evidence of one prior drug transaction was admissible to show *modus operandi*; not a "whodunit" case); *United States v. Kieffer*, 68 Fed. Appx. 726 (7th Cir. 2003) (in a case concerning sexual abuse of 12- and 13-year old girls on car trips, evidence that defendant previously made a sexual proposition to a 17-year old during a car trip was admissible to show defendant's *modus operandi*; identity not an issue); *Petrovic*, 2008 WL 818309, at *2 (evidence of prior citizen complaints against defendant police officer concerning the use of excessive force is admissible to establish defendant's intent, plan, *modus operandi*, and absence of mistake in using excessive force against plaintiff; identity not an issue); *cf. Treece*, 213 F.3d at 360 (7th Cir. 2000) (observing the admissibility of *modus operandi* evidence in a case where identity not an issue).

　　To the extent that the discussion in *Newsome* concerning the first part of the four-part test can be read to counsel against admission of Rule 404(b) evidence in this case, it should be rejected. This non-precedential case represents one example of an extremely narrow construction of the first prong of the four-part test, one that is in tension with the weight of Seventh Circuit authority that supports admission of Plaintiff's Rule 404(b) evidence. *See, e.g., Wilson*, 6 F.3d at 1238; *Conley*, 21 F.3d at 464; *Zapata*, 871 F.2d at 620; *Edwards*, 31 F. Supp. 2d at 1074-75; *Petrovic*, 2008 WL 818309, at *2. Additionally, as noted above, *Newsome*'s holding turned on the second prong of the four-part test, not the first–and, as discussed below, that holding also conflicts with the weight of Seventh Circuit authority.

Defendants also rely on *United States v. Simpson*, 479 F.3d 492 (7th Cir. 2007), but contrary to their assertion, *Simpson* does not hold that *modus operandi* evidence is relevant *only if* identity is at issue. Instead, *Simpson* merely held that one way of proving identity is through *modus operandi*:

> [o]ne way we have allowed admission of a defendant's prior bad acts is to prove identity through evidence of a defendant's distinctive manner of operation, of *modus operandi*. We only allow evidence to be admitted under the *modus operandi* theory when the evidence bears "a singular strong resemblance to the pattern of the offense charged" with the similarities between the two crimes "sufficiently idiosyncratic to permit an inference of pattern for purposes of proof."

*Id.* at 497-98.

### B. Intent

Plaintiff's Rule 404(b) evidence is relevant and admissible to show intent because Plaintiff seeks punitive damages. This court, in accordance with the case law in this Circuit, has held that intent is at issue where a plaintiff seeks punitive damages. *See Gonzalez v. City of Elgin*, 2010 WL 3306917, at *2 (N.D. Ill. Aug. 19, 2010) ("Plaintiffs also seek punitive damages…so [defendant's] intent is relevant to a matter at issue in this lawsuit.") (citing *Alexander v. City of Milwaukee*, 474 F.3d 437, 453 (7th Cir. 2007); *Edwards*, 31 F. Supp. 2d at 1075 n.8); *United States Gypsum Co. v. Lafarge No. Am. Inc.*, 2009 WL 3871823 (N.D. Ill. 2009) ("mental state is a fact of consequence because at least some of plaintiff's claims may support an award of punitive damages, should the jury determine that defendants acted willfully, or with such gross negligence as to indicate a wanton disregard of the rights of others."); *Akbar v. City of Chicago*, 2009 WL 3335364, at *1 (N.D. Ill. Oct. 14, 2009) ("a plaintiff's claim for punitive damages puts a § 1983 defendant's intent at issue"). "The degree of reprehensibility [of the defendant's conduct] is the most significant factor" in determining punitive damages, and "whether the conduct involved repeated actions" is a factor to be considered when determining

reprehensibility. *Estate of Moreland v. Dieter*, 395 F.3d 747, 756-57 (7th Cir. 2005); *see also Williams v. ConAgra Poultry Co.*, 378 F.3d 790, 797 (8th Cir. 2004) ("an incident that is recidivistic can be punished more harshly than an isolated incident") (citing *State Farm Mut. Automobile Ins. Co. v. Campbell*, 538 U.S. 408, 423 (2003)); *Motherway, Glenn & Napleton v. Tehin*, 2003 WL 21501952, at *7 (N.D. Ill. June 26, 2003) (holding that evidence of other acts of misconduct by defendant "is admissible and is considered for the limited purposes permitted under Fed. R. Evid. 404(b) as evidence that Defendants' actions in the present situation were willful and intentional and part of a larger plan. That evidence demonstrates the reprehensibility of Defendants' conduct here.").

In arguing otherwise, Defendants misleadingly cite to *United States v. Gruttadauro*, 818 F.2d 1323, 1328 (7th Cir. 1987), to suggest that "intent" in the 404(b) sense means only "specific intent," but *Gruttadauro* says no such thing. Rather, *Gruttadauro* held that "[e]vidence of prior bad acts is admissible to prove intent if intent is automatically in issue or if the defendant puts his or her intent in issue." *Id.* at 1327. Here, intent is automatically in issue because Plaintiff seeks punitive damages. Moreover, *Gruttadauro* went on to explain that "intent is automatically in issue *in a criminal case*, for the purpose of 404(b), if the crime is a 'specific intent' crime." *Id.* at 1327-28 (emphasis added). This language does not in the least suggest that "intent" in Rule 404(b) means only "specific intent."

Moreover, Plaintiff's Rule 404(b) evidence is admissible to show Defendants' intent to extract an involuntary confession from Plaintiff. The Seventh Circuit's decision in *Wilson* is directly on point: the court reversed the district court's decision to exclude Andrew Wilson's evidence of two other individuals who had been tortured and beaten by Burge and other officers. The court held, "[i]f Burge had used an electroshock device on another suspect only a few days

7

previously, this made it more likely (the operational meaning of 'relevant') that he had used it on Wilson.…Although evidence of prior bad acts is inadmissible to prove a propensity to commit such acts, it is admissible for other purposes, including intent, opportunity, preparation, and plan.…Jones's evidence would have served all four of these purposes, White's all but the third (preparation); and, since Burge had denied under cross-examination that he had ever had or used an electroshock instrument, Jones's evidence could also have been used to impeach that denial." 6 F.3d at 1238.

Voluntariness depends on the totality of the circumstances. Part of the totality of the circumstances is the circumstances as reported by Defendants; that is, to the extent that the Defendants claim that they had no intent to coerce a confession out of Plaintiff, then Plaintiff is entitled to present evidence demonstrating otherwise. The jury must evaluate what factors shaped Plaintiff's state of mind, and Plaintiff's state of mind is influenced by the Defendant's intent to coerce and methods used to coerce. Defendants' intent manifested itself outwardly in coercive methods, and these methods shaped Plaintiff's state of mind and the way he experienced the interrogation.

In dispute is whether Defendants used physical violence, amongst other methods, to coerce a false confession from Plaintiff, and if Defendants had an intention to use violence, then it makes it more likely that they did use violence. Thus, Defendants' intent is probative because the intent to coerce is consistent with Plaintiff's version of events and inconsistent with Defendants' version. "[T]he 'intent' exception to Rule 404(b) may [] be used…to admit prior [acts] 'because the repetition of the act is itself circumstantial proof of intent, not direct proof of a propensity to commit [the act]." *Young v. Rabideau*, 821 F.2d 373, 379 (7th Cir. 1987) (quoting

*United States v. Fountain*, 768 F.2d 790, 805 (7th Cir. 1985) and citing *Carson v. Polley*, 689 F.2d 562, 572-73 (5th Cir. 1982)).

This principle has been applied repeatedly in cases involving excessive force during interrogations. In *Carson*, the Fifth Circuit admitted the performance evaluation of the defendant Deputy Sheriff, after finding that the Deputy's "loss of temper and consequent intentional hostility towards other detainees on earlier occasions made it more likely that a similar intent was present in [the Deputy's] conduct towards [the plaintiff]." *Carson*, 689 F.2d at 573. And in *Edwards v. Thomas*, 31 F. Supp. 2d 1069 (N.D. Ill. 1999), the court held that evidence of the defendant's prior bad act was admissible at trial because his history of abusive interrogations demonstrated his "intention to commit assault and battery on [the plaintiff]." *See also Finley v. Lindsay*, No. 97 C 7623, 1999 WL 608706, at *3 (N.D. Ill. Aug. 5, 1999) (defendant officer's disciplinary record admissible to show officer's intent to commit assault and battery).

## II.     The Other Acts Are Similar Enough And Close Enough In Time To Be Relevant To The Matter In Issue

### A.     Similarity Of The Other Acts

In order for a prior act to satisfy the second prong of the Rule 404(b) test, the underlying facts must be sufficiently similar to the pending matter and have occurred close enough in time to be relevant. *Zapata*, 871 F.2d at 621. The Courts have cautioned, however, that the 404(b) witness's experience need not be identical to Plaintiff's to be admissible. *See United States v. York*, 933 F.2d 1343, 1351 (7th Cir. 1991) (if prior act is sufficiently similar in type, it need not be a "duplicate[] of the ones for which the defendant is now being tried"), overruled on other grounds by *Wilson v. Williams*, 182 F.3d 562 (7th Cir. 1999); *see also United States v. Radseck*, 718 F.2d 233, 236 (7th Cir. 1983) (same). Where *modus operandi* is at issue, similarities should be "sufficiently idiosyncratic to permit an inference of pattern for purposes of truth." *United*

*States v. Hudson*, 884 F.2d 1016, 1021 (7th Cir. 1989). And, "[i]ntent, unlike modus operandi, does not require a 'singular strong resemblance' between the prior bad act and the conduct alleged, but instead requires a lesser showing of similarity." *Akbar*, 2009 WL 3335364, at *2 (comparing *United States v. Robinson*, 161 F.3d 463, 468 (7th Cir. 1998) with *United States v. Lloyd*, 71 F.3d 1256, 1265 (7th Cir. 1995) (holding that the 404(b) analysis need not be unduly rigid)).

Plaintiff's Rule 404(b) evidence meets this standard. Despite Defendants' attempt to find minute differences between the acts of coercion against Plaintiff and the other suspects, they are sufficiently similar to show both intent and *modus operandi*. The interrogation approach that Defendants took against Plaintiff, Arnold Day, Derrick Flewellen, Oscar Gomez, Curtis Milsap, Abel Quinones, Tyrone Reyna, Clayborn Smith, Enrique Valdez, Kilroy Watkins, and Robert Wilson, all followed the following pattern:

- Each interrogation occurred in a closed interrogation room where the suspect under interrogation was segregated from outside observers, family, friends, and advisors and denied access to a lawyer or a phone.

- In each instance, Defendant Halloran or Boudreau inflicted physical abuse against the suspect while he was restrained and unable to use his hands to defend himself against the physical assault.[1] Most of the suspects, such as Plaintiff, were handcuffed to the wall of the interrogation room, and one of them was handcuffed behind his back.

---

[1] In Milsap's case, O'Brien physically abused him. Milsap's testimony is admissible against O'Brien to the extent that O'Brien testifies and denied that he abused Dan Young during his interrogation. (See discussion below.)

- In each instance, Defendant Halloran and/or Boudreau lost their tempers and resorted to physical and psychological abuse after the suspect refused to provide an admission regarding the crime under investigation.

- In each instance, another officer (or either Halloran or Boudreau) was present in the room and failed to intervene to prevent Halloran or Boudreau from abusing the suspect, causing the suspect to believe that no other police officer would come to his aid and thereby rendering him even more vulnerable to Halloran and Boudreau's coercion.

- In each instance, Boudreau and/or Halloran told the suspects the details of the crime that they wanted the suspect to confess to and/or showed them pictures of the crime scene.

- In each instance, the suspect was young and African-American or Latino. Several of the suspects were, like Plaintiff, in their late teens or early 20's.

In sum, Defendants repeatedly used physical violence and psychological coercion, including the specific peculiarity of giving information about the crime to suspects, during interrogations to force suspects to confess to crimes that Defendants knew they did not commit. This method of interrogation is both peculiar and idiosyncratic because most detectives do not use such illicit methods in order to obtain statements from suspects. Not only does Defendants' citation to *Gonzalez v. City of Elgin*, 2010 WL 3271272 (N.D. Ill. Aug. 16, 2010), fail to support their assertion that most criminal defendants who contest the validity of their confession claim that they were beaten, *see* Defs.' Br. at 17, but the relevant question is whether Defendants' interrogation methods were too common and general to permit the inference that Defendants, as opposed to some other detectives, committed these acts against Plaintiff. Defendants have cited

nothing to support *this* assertion. It is an insult to the vast majority of hardworking Chicago police detectives who conduct proper investigations and interrogations to suggest that Defendants' methods were "garden variety" tactics commonly used by detectives to close cases.

Defendants argue that Plaintiff's case is "unique" because "1) it involves a cold case for which Hill was not a suspect prior to speaking with detectives; 2) Boudreau alone is alleged to have coerced Hill to confess with physical violence and hollering, and without any threats or promises, and 3) the confession itself was allegedly obtained by a unique method, in which Hill repeated information learned from Boudreau while along with ASA Rogers and a court reporter." Defs.' Br. at 20. As explained below, none of these are reasons for distinguishing between Plaintiff's interrogations and those of the 404(b) witnesses.

First, Defendants do not explain why the fact that Kathy Morgan's case was a "cold case" should distinguish the circumstances of Hill's interrogation of those of his 404(b) witnesses. Several of his 404(b) witnesses, i.e., Day, Watkins, Gomez, and Quinones, were also arrested several months after the crimes that they allegedly committed took place. Defendants' intent and *modus operandi* in these—and the other cases—was the same: to close a case by beating a confession out of the suspect.

Moreover, Hill did not "volunteer" knowledge about the Morgan murder or "initiate" the questioning, as Defendants claim, *see* Defs.' Br. at 23-24. After Plaintiff's line-up for unrelated robberies, Defendants handcuffed him to the wall the interrogation room and began asking him whether he knew about any murders in the neighborhood. At first, Hill told Defendants that he did not know anything, but when Defendants persisted, Hill recalled hearing about a murder of a woman in a building and that the building had been set on fire. Defs.' Ex. A at 299-310. Hill then

told Defendants that he didn't have anything to do with the murder. *Id.* at 312-13. Nevertheless, Defendants told him that he did it and that he was there. *Id.*

Furthermore, the fact that Hill was already under arrest for the unrelated robberies might make him different from the others, but it doesn't make Defendants' interrogation method of him any different from the others. As with the other suspects, Defendants used physical violence on Plaintiff, repeatedly told him that he was the one who committed the crime, showed him pictures of the crime scene and/or victim, told him details about the crime, and told him what he should tell the ASA about his involvement in the crime. Defs.' Ex. A at 313-15, 319-23, 325-30, 368-69. Both Halloran and Boudreau accused Plaintiff of being involved in the murder and told him details about the crime (such as where the crime occurred and what objects were found at the scene) and showed him pictures of the scene. *Id.* at 313-15. Boudreau and Halloran also drove Plaintiff to the crime scene and pointed out the building where Morgan's body was found. *Id.* at 316-17.

Second, contrary to Defendants' assertion, *see* Defs.' Br. at 24, Plaintiff never testified that it was only Boudreau's conduct that caused him to confess. *See* Defs.' Ex. A at 321-25, 328, 331. Although it was Boudreau and not Halloran who struck Plaintiff, Halloran participated in coercing Plaintiff as well, by telling him he committed the crime, showing him pictures of the scene, telling him details of the crime, and not intervening when Boudreau grabbed and yelled at Plaintiff. *See id.* at 313-15, 319-23, 325-30, 368-69. Furthermore, Halloran was present when Boudreau hollered and screamed at Plaintiff, grabbed him by the shoulders, and yelled into his ear. *Id.* at 321-23. Plaintiff testified that he was scared of Boudreau and Halloran. *Id.* at 401. The fact that Halloran did not strike Plaintiff does not distinguish Defendants' method in this case from their method in the others. It was Boudreau and Halloran's *modus operandi* to switch roles

13

with each other or another detective (such as Maslanka, Foley, O'Brien); in some instances, Boudreau was the one who did the beating, and in other instances, Halloran was the one who did the beating, but in all cases, another detective was present. In all cases, the purpose of having one detective use force while another stood by was to cause the suspect to understand that no other officer would intervene to help the suspect and render him even more vulnerable to the coercion.

Also contrary to Defendants' contention, Defendants did use other coercive tactics on Plaintiff besides yelling and physical abuse. Defendants promised Plaintiff that it would be easier on him if he confessed. *Id.* at 320-21. Defendants kept Plaintiff in custody for twenty-six hours before he gave his confession. Defs.' Ex. A at 214, 392-94.The fact that Defendant did not deny Plaintiff food does not sufficiently distinguish his case from the others, in light of the striking similarities.

Third, Defendants claim that the "technique" used to obtain Plaintiff's confession— feeding him facts about the crime so that he could repeat it in his statement—was unlike that used in the other cases. *See* Defs.' Br. at 24-25. This is simply untrue. In Plaintiff's case, as in the others (as detailed below), Defendants gave details of the crime to the suspect so that he could repeat these facts in his confession. Moreover, Plaintiff was not alone with ASA Rogers when he gave his court-reported statement. The statement itself shows that Halloran was present, Defs.' Ex. at 1, and in several of the other cases, one of the Defendants or another detective working with them was also present for the statement. Also contrary to Defendants' assertion, Plaintiff did not admit that the statement constituted "his words." *See* Defs.' Br. at 25. Plaintiff stated that the whole statement was false, that he gave the answers to the questions in the statement under coercion, and that what the court reporter took down was "[w]hat Detective Boudreau told me to say." Defs.' Ex. A at 415-17.

14

Defendants' heavy reliance on the district court's decision in *Newsome* to argue that the Defendants' methods of interrogating other suspects is insufficiently similar to their interrogation of Plaintiff is unavailing. *Newsome*'s rejection of the proffered 404(b) evidence based on dissimilar "details" between the incident at issue in that case and the prior incident, *see Newsome*, 2000 WL 1047822, at *5, is contrary to Seventh Circuit case law, which holds that the other acts need not be a "duplicate" of the one now being tried. Furthermore, the other cases cited by Defendants to argue that Plaintiff's other acts evidence is insufficiently similar, *see* Defs.' Br. at 16, are distinguishable. *Hudson v. District of Columbia*, 558 F.3d 526 (D.C. Cir. 2009), is distinguishable because plaintiff's counsel in that case explicitly argued that the police officer's prior acts of improper use of force and filing false reports showed that if he was a bad cop on one day of the week, he was a bad cop on all other days of the week. That is, plaintiff in that case used defendant's prior acts only to show propensity, not any permissible use under Rule 404(b). Similarly, in *Hopson v. Frederickson*, 961 F.2d 1374 (8th Cir. 1992), plaintiff's counsel expressly argued that defendant's prior acts should have been admitted to show "proclivity to engage" in bad conduct, which is exactly what Rule 404(b) prohibits.

Plaintiff explains the similarities between his case and the others as follows:

### 1.     Kilroy Watkins

Watkins was coerced into falsely confessing to murder by Halloran and Boudreau two months before Plaintiff's arrest. During the interrogation, he was, like Plaintiff, handcuffed to the wall, grabbed, choked, hit, and denied counsel. Halloran accused him of committing the shooting, and when he denied it, Halloran stormed out and brought Boudreau in. Defs.' Ex. K at 161. Boudreau then yelled at Watkins, told him to stop "bullshitting" and grabbed him in a chokehold and struck him on the head with an open hand. *Id.* at 162-63. The questioning

continued from Halloran. *Id.* at 163. As with Plaintiff, when Watkins denied involvement or refused to make a statement implicating himself, he was further beaten by Boudreau. *Id.* at 161-63. The ASA, Boudreau, and Halloran came in with a prepared statement. When Watkins tried to read it, Boudreau grabbed him by the neck and said, "we don't have time for this shit" and held Watkins until he dropped the statement. *Id.* at 171-73. Then, Halloran told Watkins that he needed to sign each page and initial the statement. *Id.* at 173. Watkins finally succumbed and gave a false statement out of fear. As with Plaintiff, Halloran did not hit Watkins, but he was present for and failed to intervene in Boudreau's abuse. As with Plaintiff, Halloran also participated in the coercion by being present for Watkins' statement. Watkins had been in custody for 36 hours by the time he made the false statement. *Id.* at 273-74. Similarly, Plaintiff had been in custody for 26 hours by the time he made his false statement.

Despite these similarities, Defendants argue that Watkins is insufficiently similar to Plaintiff because (1) he gave a statement because Halloran promised that he would not be charged; (2) he was beaten by Boudreau in the presence of Halloran whereas Plaintiff was not; (3) he was deprived of food, drink, and washroom, whereas Plaintiff was not; and (4) Watkins' statement was fabricated whereas Plaintiff's was not. Defs.' Br. at 36-37. These arguments should be rejected because (1) Watkins testified that he decided to sign the statement because Boudreau "got physical" and he was exhausted after having been detained for so long, Defs.' Ex. K at 273, not because Halloran promised that he would not be charged; (2) Halloran was present for some of the physical abuse that Boudreau used on Plaintiff, *see* Defs.' Ex. A at 320-24; (3) deprivation of food, drink, and washroom was not the reason that Watkins gave a false statement—he, like Plaintiff—gave a false statement because of the physical abuse and long detention, *see* Defs.' Ex. K at 273; and (4) both Watkins and Plaintiff gave false statements;

16

Plaintiff testified that the words in the statement he gave were Boudreau's, *see* Defs.' Ex. A at 417.

### 2. Oscar Gomez

Gomez was coerced into falsely confessing to murder by Boudreau, Halloran, O'Brien, and another officer three years after Plaintiff's arrest. Like Plaintiff, Gomez was 18 years old at the time. *See* Defs.' Ex. Q (Statement of Gomez at 1). Defendants' abuse of Gomez is similar to their abuse of Plaintiff. During his interrogation, he was handcuffed to the wall, pushed, choked, kicked, punched, grabbed by the hair, had a gun put to his head, thrown off a chair, and denied counsel. *Id.* at 84-89, 97-98. When Gomez denied involvement or refused to make a statement implicating himself or others, he was, like Plaintiff, told that that was not what the detectives wanted to hear, and he was further beaten. *See id.* at 79-81. Like Plaintiff, Boudreau and Halloran showed him photos of the victim and crime scene and told him over and over that he did it. *Id.* at 85, 91, 95-96. Also like Plaintiff, Boudreau told Gomez what he wanted Gomez to say in his statement, and Gomez agreed to it out of fear. *Id.* at 110. Gomez was in custody for at least 24 hours. *Id.* at 173. He finally succumbed and gave a false statement out of fear. *Id.* at 101-02. Despite his confession, he was acquitted of all charges at trial.

Defendants argue that Gomez is insufficiently similar to Plaintiff because Defendants threatened to arrest Gomez's father, the conduct of the Defendants was more violent, and Gomez was deprived of sleep, food, water, and washroom. These are distinctions without a difference. First, Gomez never testified that he was coerced only by the threat to his father; Defendants' physical abuse and long interrogation exhausted and scared him. *See id.* at 102. Defendants also make the ridiculous assertion that "[u]nlike Hill, Gomez does not allege that he was coerced to make incriminatory statements…Gomez only alleges that he was coerced into signing a

17

statement, which he claims Boudreau fabricated." Defs.' Br. at 42-43. Plainly, both Hill and Gomez were coerced by Defendants into giving false, incriminatory statements. The fact that one of them took the form of a court-reported statement and the other took the form of a handwritten statement is of no significance in analyzing whether evidence of Gomez's coercion is admissible under Rule 404(b).

### 3. Tyrone Reyna

Reyna was coerced into falsely confessing to murder by Halloran, Boudreau, and O'Brien eleven months after Hill. Reyna was 16 years old at the time. *See* Defs.' Ex. S (Statement of Reyna at 1). During the interrogation, he was punched, kicked, handcuffed to a chair, slapped across the room, and smacked. Defs.' Ex. S at 58-60, 137, 147-48. Boudreau, Halloran, and O'Brien beat him. *Id.* at 59-60. Like Plaintiff, he was driven around outside of the police station to view alleged evidence of the crime. *See id.* at 131-32. When he denied involvement or refused to make a statement implicating himself, he was further beaten. He finally succumbed and gave a false statement out of fear. *Id.* at 151.

Defendants attempt to distinguish Reyna on the grounds that he (1) was "tricked" into signing a confession with promises that he could go home; (2) does not allege physical abuse by Boudreau; (3) threats to his girlfriend and family caused him to confess; and (4) simply read aloud a handwritten statement fabricated by the police. *See* Defs.' Br. at 47. Defendants' arguments should be rejected because (1) Reyna knew that he was signing a confession, but he did so because he was scared and wanted to get out of there, *see* Defs.' Ex. S at 150-51, 166; (2) he does allege physical abuse by Boudreau, *see id.* at 60, and even if he didn't, it was Boudreau and Halloran's *modus operandi* to switch off on who was doing the physical abuse; (3) he signed the false confession not only because of the threats to his family but also because he was

"smacked around," *see id.* at 169, like Hill; and (4) also like Hill, he agreed to a false statement created by Boudreau, *see id.* at 150.

### 4. Clayborn Smith

Smith was coerced into falsely confessing to murder by Boudreau, Halloran, O'Brien, and another detective seven months after Hill. During his interrogation, he was handcuffed to a wall, yelled at, kicked, punched, pushed, grabbed by his hair, head and neck, had his head forced between his legs, held down while being punched and had his fingers bent, and denied counsel. *See* Defs.' Ex. T at 130-31, 139, 141-52, 208, 235-36, 253, 256. When Smith denied involvement or refused to make a statement implicating himself, he was further beaten. He finally succumbed and gave a false statement out of fear of the detectives. As with Plaintiff, Boudreau and Halloran gave Smith information that he learned from the investigation, fed him details of the crime, and told him what to say to the ASA (told him to make it sound like self-defense). *Id.* at 210-13, 246. During his court-reported statement, he just repeated the details of the crime as Boudreau had told him. *Id.* at 302-04. As with Hill, they were Boudreau's words, but they came out of Smith's mouth. *Id.* at 302.

Defendants' attempts to distinguish Smith should be rejected. First, Boudreau, Halloran, and O'Brien all yelled at and used physical force on Smith. *See id.* at 253-56 (Boudreau grabbed Smith by the neck), 267, 271-282, 278 (Boudreau held Smith down by the neck while O'Brien punched him). Second, although the detectives used coercive tactics on Smith besides striking and yelling, Smith said, "all right, all right" and agreed to confess when the detectives were beating him. *Id.* at 282-83. Third, like Hill, Boudreau told Smith details of the crime, fed him information, and told him what to say to the ASA. *Id.* at 210-12, 246. Boudreau also showed Smith pictures of the victim's body, just as he had shown pictures of the crime scene to Hill. *Id.*

at 265. Like Hill, Smith was not alone with the ASA when the court-reported statement was

given. *See id.* at 290-91; Defs.' Ex. U (Statement of Smith, reflecting Boudreau's presence) at 1.

### 5. Abel Quinones

Quinones was coerced into falsely confessing to murder by Halloran and other detectives

three years after Hill's arrest. He was arrested for the same shooting as Oscar Gomez. Quinones,

like Hill, was 18 years old at the time. *See* Defs.' Ex. R (Statement of Quinones at 1). During the

interrogation, Quinones was grabbed by the neck, handcuffed to the wall, pushed into the ring on

the wall, grabbed by the hair, denied counsel, and deprived of sleep. *Id.* at 152-59, 162-65, 168-

69. When he denied involvement or refused to make a statement implicating himself, he was

grabbed by the neck and pinned up against the ring on the wall. *Id.* at 162-63. As with Hill,

Halloran showed Quinones pictures of the crime scene. *Id.* at 166 (shown pictures of the body),

168. He finally succumbed and signed a false statement out of fear, after 30 hours in custody. *Id.*

at 168. Halloran told Quinones how the story went, and Quinones went along with it. *Id.* at 186.

Halloran was present when Quinones gave the false statement to the ASA. *Id.*

Defendants claim that Quinones did not have any contact with Boudreau, but that is not

true. Quinones did not mention him by name, but he described a shorter detective with a

mustache who grabbed him by the neck, pinning him against the wall. *Id.* at 162-63. He also

testified that either this detective (Boudreau) or another detective pulled him by the hair. *Id.* at

169-70. Defendants also claim that detectives were already questioning witnesses to the murder,

who "gave them reason to question Quinones"—but these were his co-defendants, such as Oscar

Gomez, from whom the Defendants also coerced false statements. Defendants claim that

Quinones did not attribute any pressure to confess to physical abuse, *see* Defs.' Br. at 44-45, but

that is also untrue. Quinones stated that he was already scared after he was physically abused and

before the Defendants took the further step of telling him that witnesses had given statements against him. *See id.* at 173-74. He stated merely that he was scared, but became "terrified" after being confronted with alleged statements of others and told he was going to do a lot of time. *Id.* Quinones never said that the physical abuse had no effect on him. In addition, he said that he "had been up 32-some hours." *Id.* at 174. Finally, like Hill, Defendants told Quinones what to say in his statement, and Quinones agreed to it. *Id.* at 186.

### 6.  Arnold Day

Day was coerced into falsely confessing to murder by Defendant Boudreau and two other detectives (Foley and Evans) one month prior to Hill's arrest. Like Hill, he was 18 years old. Defs.' Ex. F at 88. Also like Hill, Day was arrested several months after the murders he was alleged to have committed. During the interrogation, he was handcuffed to the wall, choked, and threatened with being thrown out a window. When Day denied involvement or refused to make a statement implicating himself or others, he was choked. *Id.* at 114-15. Boudreau was present when Foley grabbed Day's neck and choked him. *Id.* at 122-23. He finally succumbed and gave a false statement out of his fear of the detectives. *Id.* at 123. And, as with Plaintiff, Boudreau coached Day on what to say, and Day repeated it to the ASA. *Id.* at 127 ("I was being coached by Boudreau to tell him what to write"), 131 (Boudreau gave Day his theory of what occurred and Day repeated it to the ASA).

Contrary to Defendants' argument, the fact that the murder for which Hill was arrested involved a rape and Day's involved a shooting does not distinguish them for 404(b) purposes. The point is that both were arrested for murders that the Defendants were investigating. Furthermore, although it was Detective Foley (and not Boudreau) who choked and grabbed Day, Boudreau was present. This is consistent with Defendants' *modus operandi* of switching roles

21

with each other or other detectives on who would beat a suspect in a particular case. And although Foley and Boudreau used a number of other coercive tactics on Day, Day testified that it was after he was grabbed by the neck and choked that he said he would cooperate. *Id.* at 123. Thus, it was still physical abuse, as in Hill's case, that primarily motivated his confession. Finally, Boudreau coached Day on what to say in his false statement, as he did with Hill. The fact that, in Day's case, he did this openly in front of the ASA is not a meaningful difference.

### 7.    Enrique Valdez

Valdez was coerced into falsely confessing to murder by Defendant Boudreau and Detective Maslanka about seven months prior to Hill's arrest. During his interrogation, he was handcuffed to the wall, cursed and yelled at, punched, slapped, kicked, grabbed by his hair, smashed with a table, hit in the ear, thrown on the floor, and denied counsel. Defs.' Ex. M at 83-85, 87-92, 107-08, 110-18, 121-22, 126-29. When Valdez denied involvement or refused to make a statement implicating himself, he was further beaten. *Id.* at 83-84, 89. Maslanka beat Valdez in Boudreau's presence, and Boudreau did not do anything to stop it. *Id.* at 85, 87-92, 107, 114, 121-22, 233. Boudreau also hit Valdez in the ear so hard that he heard ringing and popping in his ear. *Id.* at 127-28. He finally succumbed and gave a false statement due to his fear of the detectives and in order to stop the beating. *Id.* at 92, 108. Valdez feared being beaten by Boudreau as he was by Maslanka. *Id.* at 239-40. Like Hill, Valdez did not speak to the ASA alone when giving his statement; Maslanka was present. *Id.* at 133.

Contrary to Defendants' assertion, Valdez did not testify that "Boudreau did not force him to confess, only Maslanka did." Defs.' Br. at 33. Valdez testified that Boudreau's presence during Maslanka's beatings and failure to intervene was coercive in that he feared being beaten by Boudreau as well. Defs.' Ex. M at 233-40. Boudreau also hit Valdez so hard in the ear that it

still vibrates today. *Id.* at 236. Like Hill, Valdez gave a false statement that was concocted by the detectives. *See id.* at 131, 178-79, 225-26.

### 8. Derrick Flewellen

Flewellen was coerced into falsely confessing to murder by Boudreau and Detective Valadez. When Flewellen denied knowledge and refused to give a statement implicating himself, Boudreau punched him in the head. Defs.' Ex. P at 144-45. Boudreau also grabbed Flewellen by the neck, slammed him into a wall, punched him, and threw him down. *Id.* at 155-56. Like Hill, Flewellen was handcuffed to a ring or bar. *Id.* at 156. When Flewellen refused to sign papers that Boudreau gave to him, Boudreau hit him in the face. *Id.* at 166-67. Other detectives were in the room. *Id.* at 167. Flewellen eventually agreed to sign the papers (a false statement about the murder of Sherry Hunt) "to get everything over with so I don't have to get beaten up or hurt no more inside that room." *Id.* at 168-69. Like Hill, Flewellen denied involvement in the murders and was beaten until he agreed to give a false statement. Although Flewellen was not allowed to read the papers that he was coerced into signing, he knew that it was a confession. *See id.* at 190.

### 9. Robert Wilson

Wilson was coerced into falsely confessing by Halloran and O'Brien five years after Hill's arrest. During the interrogation, he was handcuffed to a ring, slapped, hit in the head, and had his medication withheld from him. Defs.' Ex. W at 90, 271-75, 284, 291-92, 296-99, 377. O'Brien hit Wilson and Halloran and another detective, Carroll, were aggressive and verbally abusive and threatening. *Id.* at 273-75. He was told that if he did not give a statement implicating himself, the detectives would beat him up. *Id.* at 300-02. As a result of O'Brien and Halloran's coercion, Wilson signed a false statement out of fear. *Id.* at 304. Neither Halloran nor O'Brien deny that they physically abused Wilson was he was in police custody, as well as preventing him

23

from accessing his medication, food, and sleep. Dkt. No. 275 at ¶ 46 (Plaintiff's Local Rule 56.1(b)(3)(B) Statement of Additional Facts); Dkt. Nos. 273-20 at 52-56, 79-80 (O'Brien's Wilson deposition), 273-21 at 70, 75-77, 81, 87, 91 (Halloran's Wilson deposition). Halloran and O'Brien also do not deny that they took these actions with the intent of placing Wilson in extreme fear of being hurt if he did not confess. *Id.* Finally, O'Brien does not deny that he fabricated Wilson's eventual confession, just as he did in the cases of Plaintiff, Dan Young, and Peter Williams.

The circumstances of Wilson's interrogation are sufficiently similar to Hill's for 404(b) purposes. First, as with Hill, Halloran worked with another detective—O'Brien in this instance—to coerce a confession. Second, contrary to Defendants' assertion, Halloran was verbally abusive and aggressive with both Hill and Wilson. Halloran repeatedly told Hill to confess and gave him details of the crime, while Boudreau beat Hill. Halloran did the same here, except with O'Brien. Third, although ASA Healy threatened Wilson with beatings by O'Brien, Wilson had already been beaten by O'Brien, and that is why he knew he could not withstand additional beatings. As in Hill's case, the beatings were still coming from the detectives. Fourth, although Boudreau was not present for Wilson's interrogation, Halloran's conduct is still admissible against Halloran, and although O'Brien is not a defendant, he may be called as a witness (in light of his role in coercing Dan Young's confession), and his conduct is admissible against him under Rule 404(b) to show *modus operandi* and intent.

### 10.    Curtis Milsap

Milsap was coerced into falsely confessing to murder by O'Brien and another detective, Myers seven months prior to Hill and Dan Young's arrests. Although Boudreau and Halloran were not involved in Milsap's interrogation, O'Brien was, and his method of interrogating

24

Milsap is admissible against him to show *modus operandi* and intent, in light of his role in coercing Dan Young's confession. That is, Milsap's testimony regarding O'Brien's abuse is admissible as impeachment under Rule 404(b) against O'Brien, to the extent that O'Brien testifies and denies that he coerced Dan Young. This evidence is relevant to a matter in issue because O'Brien may deny that he coerced Young's confession, and the circumstances of Young's coercive interrogation are relevant to Hill's claims for the reasons explained in Plaintiff's Response to Defendants' Motion in Limine to Bar Evidence Regarding Peter Williams and Dan Young, Jr.(Dkt. No. 503).

During the interrogation, Milsap was handcuffed to a file cabinet, slapped, and kicked in the testicles and bladder. Defs.' Ex. J at 119-27, 129-32, 143-50. When Milsap denied involvement or refused to make a statement implicating himself, he was slapped and kicked in the testicles. Both O'Brien and Myers beat him. *See id.* Similarly, during Young's interrogation, he was handcuffed, hit, and kicked in the stomach by O'Brien. Dkt. No. 273-8 at 14, 18. Like Young, Milsap finally succumbed and signed a false statement out of fear of the detectives. Milsap signed a piece of paper without reading it because Myers told him to sign it and he was scared. Defs.' Ex. J at 156. The ASA read it aloud to him, and he was scared to tell the ASA it was incorrect because O'Brien and Myers had beat him. *Id.* at 162-63.

**B.    The Other Acts Are Close Enough In Time**

There is sufficient temporal proximity between Plaintiff's interrogation and Defendants' prior and subsequent interrogation misconduct for the evidence to be admissible as to Plaintiff's coerced confession claim. Most of these other incidents took place within several months of the incident at issue, March 20, 1992 (Day—one month, Watkins—two months, Milsap and Valdez—five months, Smith—seven months, Reyna—11 months), and the rest took place within

25

three or five years (Flewellen, Gomez, Quinones, Wilson). Courts are liberal about temporal proximity, and cases have found allegations that involve conduct from a decade ago or longer to be close enough in time to provide admissible evidence of prior bad acts. *See, e.g., Gonzalez*, 2010 WL 3306917, at *2 (holding that incident that occurred one year and three months prior to the incident at issue in the case "was sufficiently close in time" and citing *United States v. Harris*, 587 F.3d 861, 864 (7th Cir. 2009), and *United States v. Ross*, 510 F.2d 702, 713 (7th Cir. 2007) (acts from five to six years earlier were sufficiently close in time); *United States v. Wimberly*, 60 F.3d 281, 286 (7th Cir. 1995) (thirteen-year time gap); *United States v. Macedo*, 406 F.3d 778, 793 (7th Cir. 2005) (nine-year time gap); *United States v. Mounts*, 35 F.3d 1208, 1214-15 (7th Cir. 1994) (permitting admission of drug purchase that occurred seven years prior to arrest to prove intent).

Defendants also argue that Plaintiff's 404(b) evidence is not admissible to the extent that it concerns events that took place after the incident at issue in this case. This argument lacks merit, as the Seventh Circuit has expressly stated that "trial courts may admit evidence of prior *or subsequent* bad acts as long as they satisfy the four-prong test." *United States v. Brown*, 31 F.3d 484, 492 (7th Cir. 1994) (emphasis added). Plaintiff's proposed 404(b) witnesses will testify about other conduct by Defendants that is sufficiently similar and sufficiently close in time to the conduct complained of in this case that it should be admitted.

## III. The Evidence Is Sufficient To Support A Jury Finding That Defendants Committed The Similar Acts

The third part of the test for admissibility of Rule 404(b) evidence is that the evidence should be sufficient to support a jury finding that the defendant committed the similar act. Defendants argue that Plaintiff's evidence is "weak" because it "rest[s] solely on the allegations of arrestees complaining about the conduct of police officers." Defs. Br. at 54. But under

26

established Seventh Circuit law, a jury can reasonably conclude that the similar act occurred if the plaintiff has "*actual evidence*, in the form of sustained complaints or potential witness testimony, that [he] hope[s] to introduce." *Okai v. Verfuth*, 275 F.3d 606, 611 (7th Cir. 2001), citing *Wilson*, 6 F.3d at 1238 (use of witness testimony), and *Edwards*, 31 F. Supp. 2d at 1074 (use of sustained complaint); *see also Petrovic*, 2008 WL 818309, at *2. *Either* potential witness testimony *or* sustained complaints constitute sufficient evidence. Here, Plaintiff has potential witness testimony by Watkins, Day, Valdez, Flewellen, Gomez, Quinones, Smith, Reyna, Wilson, and Milsap.[2] The jury is wholly capable of listening to the testimony by Plaintiff's witnesses and deciding for itself whether these witnesses are credible. *See York*, 933 F.2d at 1352 ("We determine only whether the jury could by a preponderance have reasonably determined that the other act occurred. This inquiry is no different than any sufficiency of the evidence challenge and the party challenging admissibility has the heavy burden of showing that no reasonable jury could have reached the same conclusion.").

Thus, the fact that some of the O.P.S. complaints filed by some of these witnesses against Defendants or other detectives were deemed "not sustained" or "unfounded" has no bearing on their admission. None of the cases cited by Defendants, *see* Defs.' Br. at 55, hold otherwise. Plaintiff is not seeking the admission of the O.P.S. files. Plaintiff is seeking admission of these witnesses' testimony. Moreover, Defendants argue that because most of the witnesses allege misconduct by only one of either Boudreau or Halloran (in addition to other non-party detectives), their testimony should be rejected against both. That makes no sense. If a witness has admissible testimony against a particular defendant, it is admissible against that defendant.

---

[2] As explained above, Milsap's testimony is admissible as impeachment against Detective O'Brien, to the extent that he is called as a witness, testifies, and denies that he coerced Dan Young. Rule 404(b) is not limited in its application to defendants; it is admissible against non-party witnesses as well. *See* Fed. R. Evid. 404(b).

Similarly, if a witness (such as Curtis Milsap) can provide admissible testimony impeaching the credibility of another witness (Detective O'Brien), that testimony is admissible against that witness, even if it is not relevant to the Defendants. *See Wilson*, 6 F.3d at 1238 (witnesses' testimony about Burge's other acts of using electroshock could be used to impeach Burge's denial on cross-examination that he used electroshock).

Defendants argue at length about the fact that some of the witnesses' testimony about their coercive interrogations has been rejected in motion to suppress hearings or other proceedings in state court. *See* Defs.' Br. at 56-60. But these prior credibility determinations by entirely different factfinders cannot be given offensive collateral estoppel effect on Plaintiff because, among other things, Plaintiff did not have the opportunity to participate in the litigation of those matters in those courts. Moreover, those factfinders were not presented with the same evidence that Plaintiff now has of Defendants' pattern of misconduct. Each of those factfinders viewed the testimony of the witnesses in isolation, whereas here, the jury will have the opportunity to hear from 10 different witnesses about the same abuse Defendants inflicted on each. In any event, Defendants have cited no case suggesting that there is any such collateral estoppel effect or that the jury must give credence of any kind to prior credibility determinations by judges. The jury in this trial will be free to weigh the testimony of Plaintiff's witnesses on their own and decide whether the witnesses are credible.[3]

_____

[3] With respect to Tyrone Reyna, Defendants argue that he has made wavering identifications of Boudreau and Halloran. Defs.' Br. at 57. Reyna's ability (or inability) to identify the Defendants as the officers who coerced him goes to the weight of his testimony, not its admissibility. Reyna's testimony is still sufficient for a jury to reasonably conclude that Defendants coerced his confession. Defendants also make the nonsensical argument that Smith's identification of Defendants is suspect simply because there may be some reason to doubt his identification of Detective O'Brien. Smith did not give wavering identifications of Halloran or Boudreau at his deposition. *See* Defs.' Ex. U at 124-26. There is certainly no doubt that Boudreau participated in Smith's interrogation, because he is listed as being present for Smith's statement. *See* Defs.' Ex. U.

In sum, Plaintiff's witnesses will testify from their personal knowledge about their personal experience with Defendants Halloran and Boudreau (and Detective O'Brien). If their testimony is believed, the jury can properly find that Defendants engaged in the conduct described. Contrary to Defendants' suggestion, there is no additional requirement that Defendants be found guilty of this conduct by O.P.S. or any other entity before these witnesses' testimony can be admitted. Under *Okai*, there is simply no basis for the conclusion that the witnesses' testimony will not be sufficient to support a jury finding that Defendants committed the acts that they will say Defendants committed.[4]

## IV. The Probative Value Of The Evidence Is Not Substantially Outweighed By The Danger Of Unfair Prejudice

The fourth prong of the test for admissibility of Rule 404(b) evidence is that its probative value must not be substantially outweighed by the danger of unfair prejudice. *Zapata*, 871 F.2d at 620. Defendants cite no real unfair prejudice that can result from Plaintiff's proffered evidence because, in fact, there is none. Although their testimony may be prejudicial to Defendants, all evidence that is relevant is necessarily prejudicial. The Federal Rules of Evidence protect only against *unfair* prejudice. As courts have repeatedly recognized, any prejudice that may result can be mitigated against by an appropriate instruction to the jury that it is to consider the evidence only for purposes of establishing Defendants' *modus operandi*, intent, or knowledge, etc., and not to establish bad character. *See United States v. Denburg*, 212 F.3d 987, 994 (7th Cir. 2000); *United States v. Hernandez*, 84 F.3d 931, 935-36 (7th Cir. 1996); *United States v. Brooks*, 125 F.3d 484, 500 (7th Cir. 1997) (stating that "limiting instructions are sufficient to cure any

---

[4] Finally, Defendants claim that Plaintiff's witnesses are not credible, but both Halloran and O'Brien initially asserted the Fifth Amendment when asked at their depositions about their abuse of these other suspects. By asserting the Fifth, they were essentially saying that a truthful response might subject them to criminal liability, even though there was no pending criminal investigation. This casts doubt on their credibility.

29

potential prejudice resulting from the admission of 404(b) evidence"); *Petrovic*, 2008 WL 818309, at *4. Juries are presumed to follow instructions, and Defendants' assumption otherwise should be rejected.

Defendants argue that admission of Plaintiff's 404(b) evidence will cause unfair prejudice because the evidence is minimally probative. But as argued above, this evidence is highly probative of Defendants' *modus operandi* and intent.

Defendants also raise the specter of the jury deeming Defendants guilty by association if there is testimony about "events in which Boudreau or Halloran was not involved, or in which he was not responsible for any abuse." Defs.' Br. at 63. This is not a real concern. First, several of these incidents involve both Halloran and Boudreau (Watkins, Gomez, Reyna, Smith), and the rest (except for Milsap) involve either Halloran or Boudreau. (As discussed above, Milsap was coerced by O'Brien, and that evidence is admissible against O'Brien.) Second, as argued above, although Halloran and Boudreau switched roles in terms of who committed most of the physical abuse in a particular case, they both participated in the coercive interrogation of these suspects by their presence and failure to intervene.

Defendants argue that they will be prejudiced because Plaintiff intends to seek damages or vindicate claims on behalf of others in this litigation. Defs.' Br. at 65-67. This argument is a non-starter. Plaintiff is not seeking damages on behalf of these other witnesses, and the jury will be given instructions that allow it to find damages only for Plaintiff (should it find liability). Nor is Plaintiff seeking to litigate the claims of these other witnesses in this trial.

Finally, Defendants raise the specter of a "trial within a trial." *See* Defs.' Br. at 69. It's true that admission of Plaintiff's 404(b) evidence will make the trial longer than it otherwise would be. But that is not enough to exclude this evidence. The question under Rules 404(b) and

403 is whether the probative value of the evidence is *substantially outweighed* by the danger of unfair prejudice, undue delay, or needless presentation of cumulative evidence. As discussed above, the testimony of these witnesses is highly probative of Defendants' intent and *modus operandi* – Defendants used the same coercive methods over and over again to force the same kinds of suspects (young minority men) into falsely confessing to murders. The probative value of this evidence far outweighs the risk of prejudice or undue delay.

## CONCLUSION

For the foregoing reasons, Defendants' Motion *in Limine* to Bar Evidence of Ten Other Acts should be denied, with any remaining objections to be adjudicated in the context of the evidence at trial.

RESPECTFULLY SUBMITTED,

  s/Russell Ainsworth
Attorneys for Harold Hill

Arthur Loevy
Jon Loevy
Michael Kanovitz
Russell Ainsworth
LOEVY & LOEVY
312 North May Street
Suite 100
Chicago, IL 60607
(312) 243-5900

31

## <u>CERTIFICATE OF SERVICE</u>

  I, Russell Ainsworth, an attorney, certify that on June 27, 2011, I delivered by electronic means a copy of the attached Response to all counsel of record.

s/Russell Ainsworth
_____
