# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

HAROLD HILL,              )
                                       )
            Plaintiff,        )
              v.              )      Case No. 06 C 6772
                                       )
CITY OF CHICAGO, et al.,     )
                                       )
            Defendants.    )

## MEMORANDUM OPINION AND ORDER

AMY J. ST. EVE, District Court Judge:

Defendants have moved pursuant to Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), to bar Richard J. Brzeczek from testifying as an expert witness on police practices. After the parties submitted their briefs on this *Daubert* motion, the Court conducted an evidentiary hearing on May 23, 2011, at which Brzeczek testified. For the reasons discussed below, the Court grants in part and denies in part Defendants' motion.

## LEGAL STANDARD

"The admissibility of expert testimony is governed by Federal Rule of Evidence 702 and the Supreme Court's opinion in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993)." *Lewis v. Citgo Petroleum Corp.*, 561 F.3d 698, 705 (7th Cir. 2009). Rule 702 provides, in relevant part, that "[i]f scientific, technical or other specialized knowledge will assist the trier of fact[,] . . . a witness qualified as an expert by knowledge, skill, experience, training or education, may testify thereto in the form of an opinion. . . ." *Id.* "It also requires that: (1) the testimony must be based upon sufficient facts or data; (2) it must be the product of reliable principles and methods; and (3) the witness must have

applied the principles and methods reliably to the facts of the case." *Happel v. Walmart Stores, Inc.*, 602 F.3d 820, 824 (7th Cir. 2010).

Under the expert-testimony framework, courts perform the gatekeeping function of determining prior to admission whether the expert testimony is both relevant and reliable. *See id.*; *United States v. Pansier*, 576 F.3d 726, 737 (7th Cir. 2009) ("To determine reliability, the court should consider the proposed expert's full range of experience and training, as well as the methodology used to arrive [at] a particular conclusion."). In doing so, courts employ a three-step analysis: "[T]he witness must be qualified as an expert by knowledge, skill, experience, training, or education[;] the expert's reasoning or methodology underlying the testimony must be scientifically reliable; and the testimony must assist the trier of fact to understand the evidence or to determine a fact in issue." *Ervin v. Johnson & Johnson, Inc.*, 492 F.3d 901, 904 (7th Cir. 2007) (internal quotations and citations omitted); *see also Pansier*, 576 F.3d at 737. As the Seventh Circuit instructs, "'[t]he focus of the district court's *Daubert* inquiry must be solely on principles and methodology, not on the conclusions they generate.'" *Winters v. Fru-Con Inc.*, 498 F.3d 734, 742 (7th Cir. 2007) (quoting *Chapman v. Maytag Corp.*, 297 F.3d 682, 687 (7th Cir. 2002)). "The goal of *Daubert* is to assure that experts employ the same 'intellectual rigor' in their courtroom testimony as would be employed by an expert in the relevant field." *Jenkins v. Bartlett*, 487 F.3d 482, 489 (7th Cir. 2007) (quoting *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152, 119 S.Ct. 1167, 143 L.Ed. 2d 238 (1999)).

In *Daubert*, the Supreme Court offered the following non-exclusive factors to aid courts in determining whether a particular expert opinion is grounded in a reliable scientific methodology: (1) whether the proffered theory can be and has been tested; (2) whether the

theory has been subjected to peer review and publication; (3) whether the theory has a known or

potential rate of error; and (4) whether the relevant scientific community has accepted the theory.

*See Happel*, 602 F.3d at 824; *Winters*, 498 F.3d at 742.  Further, the 2000 Advisory Committee's

Notes to Rule 702 list the following additional factors for gauging an expert's reliability: (1)

whether the testimony relates to "matters growing naturally and directly out of research . . .

conducted independent of the litigation"; (2) "[w]hether the expert has unjustifiably extrapolated

from an accepted premise to an unfounded conclusion"; (3) "[w]hether the expert has adequately

accounted for obvious alternative explanations"; (4) "[w]hether the expert is being as careful as

he would be in his regular professional work outside paid litigation consulting"; and (5)

"[w]hether the field of expertise claimed by the expert is known to reach reliable results for the

type of opinion the expert would give."  *Id.* (internal quotations omitted); *see also American*

*Honda Motor Co., Inc. v. Allen*, 600 F.3d 813, 817 (7th Cir. 2010); *Fuesting v. Zimmer, Inc.*, 421

F.3d 528, 534-35 (7th Cir. 2005), *vacated in part on other grounds*, 448 F.3d 936 (7th Cir.

2006); *Deputy v. Lehman Bros., Inc.*, 345 F.3d 494, 505 (7th Cir. 2003) (noting that the *Daubert*

analysis is flexible); *Goodwin v. MTD Prods., Inc.*, 232 F.3d 600, 608 n.4 (7th Cir. 2000) (noting

that "the *Daubert* Court 'emphasized that it did not presume to set out a definitive checklist or

test, and that the district judge's inquiry should be flexible'") (quoting *United States v. Vitek*

*Supply Corp.*, 144 F.3d 476, 485 (7th Cir. 1998), with internal quotations from *Vitek Supply*

omitted)).

An expert may be qualified to render opinions based on experience alone.  *See Compania*

*Administradora de Recuperacion de Activos Administradora v. Titan Int'l, Inc.,* 533 F.3d 555,

561 (7th Cir. 2008) ("Testimony based solely on a person's special training or experience is

properly classified as expert testimony"). "In certain fields, experience is the predominant, if not the sole basis for a great deal of reliable expert testimony." Advisory Committee Notes to Rule 702. The Seventh Circuit has repeatedly stated that "genuine expertise may be based on experience or training." *United States v. Conn,* 297 F.3d 548, 556 (7th Cir. 2002), quoting *Tyus v. Urban Search Mgmt.,* 102 F.3d 256, 263 (7th Cir. 1996). "[W]hile extensive academic and practical expertise in an area is certainly sufficient to qualify a potential witness as an expert, Rule 702 specifically contemplates the admission of testimony by experts whose knowledge is based on experience." *Trustees of Chicago Painters & Decorators Pension, Health & Welfare & Deferred Sav. Plan Trust Funds v. Royal Int'l Drywall & Decorating, Inc.,* 493 F.3d 782, 787-88 (7th Cir. 2007) (citations and quotations omitted). As such, courts "consider a proposed expert's full range of practical experience as well as academic or technical training when determining whether that expert is qualified to render an opinion in a given area." *Id.,* quoting *Smith v. Ford Motor Co.,* 215 F.3d 713, 718 (7th Cir. 2000).

## BACKGROUND

Plaintiff Harold Hill brought this Section 1983 case against the City of Chicago, Chicago police officers, and a Cook County Assistant State's Attorney after his conviction for sexual assault and homicide was vacated based on post-conviction DNA evidence that excluded Hill from samples taken from the victim's fingernails. After the Court's ruling on summary judgment, the following claims remain in this lawsuit: (1) Hill's Fifth Amendment coerced confession claim; (2) Hill's Section 1983 conspiracy claim based on his coerced confession claim; and (3) Hill's failure to intervene claim based on his coerced confession.

Hill's case arises out of the October 14, 1990 brutal sexual assault and murder of Kathy

4

Morgan. She was murdered and left in an abandoned building on West Garfield Boulevard in Chicago, Illinois. The building and Morgan's body were set on fire in an apparent attempt to hide the crime.

On March 20, 1992, two Chicago police officers arrested Hill for possession of a stolen automobile and possession of a handgun, and then transported him to the Seventh District Police Station in Chicago. At the police station, Hill admitted to committing two armed robberies – one in Chicago and one in Oak Lawn, Illinois. During the follow-up investigation of the Chicago armed robbery, Hill participated in a line-up at the Area 3 Station at 39th Street and California Avenue on March 21, 1992. Defendant Chicago Police Detectives Kenneth Boudreau and John Halloran participated in conducting the line-up and questioned Hill about other crimes. Approximately twenty-six hours after his arrest, Hill gave a court-reported statement implicating himself and two other men, Dan Young and Peter Williams, in the Morgan crimes. Hill contends that Boudreau and Halloran, along with Assistant State's Attorney Rogers, coerced his confession. Over the next few days, the Detectives obtained written confessions from both Young and Williams. Despite Williams' confession, it was later confirmed that Williams was incarcerated at Cook County Jail on the day of Morgan's homicide.

Hill's criminal case commenced on March 22, 1992 with a probable cause to detain and bond hearing in the Circuit Court of Cook County. On April 13, 1992, Hill was indicted for the murder and sexual assault of Morgan. In September 1994, Hill and his co-defendant Dan Young were tried simultaneously – but to separate juries – for Morgan's sexual assault and homicide. The State introduced Hill's confession as evidence against him during his trial. In addition, both Hill and Young testified at trial maintaining their innocence and asserting that law enforcement

coerced them into giving their confessions. In September 1994, the juries convicted Hill and

Young for Morgan's sexual assault and homicide. Over a decade later, the results of DNA

testing resulted in the trial court vacating Hill's conviction and the State dropping the charges

against Hill.[1] Subsequently, Hill initiated this lawsuit.

In preparation for trial, Hill retained Richard Brzeczek as an expert witness to opine on

certain police practices used by Chicago police detectives in connection with their murder

investigation of Morgan. Defendants seek to exclude Brzeczek's testimony pursuant to Rule 702

and *Daubert* on the ground that his opinions are irrelevant to the remaining issues in this case

and that his opinions lack sufficient reliability to be admissible.

## ANALYSIS

**I.      Richard Brzeczek**

Hill designated Richard Brzeczek as a police practices expert under Federal Rule of Civil

Procedure 26(a)(2). Brzeczek has a Bachelor of Science from the Loyola University of Chicago,

a Masters of Public Administration from the Illinois Institute of Technology, and a Juris Doctor

from the John Marshall Law School. The Chicago Police Department ("CPD") employed

Brzeczek from 1964 through April 1983. When he left the CPD in 1983, Brzeczek was the

Superintendent of Police. Since 1983, Brzeczek has practiced law.

More specifically, Brzeczek started as a Chicago police patrolman in 1964 after which he

served as an investigator for the Youth Division, Sergeant at the Detective Division at

---

[1] On February 21, 2007, the Court granted Defendants' motion to reassign Dan Young's
Section 1983 case to this matter based on relatedness. (R. 62-1.) Young settled with the City
Defendants and the Court granted Defendant Rogers' Motion for Summary Judgment as to
Young on December 15, 2008. (R. 301-1.) As such, Young's claims are no longer at issue in
this lawsuit.

headquarters, Lieutenant of the Bureau of Inspectional Services, a Commanding Officer of the Organized Crime Division, and Captain of the Office of the Superintendent. Brzeczek also served in other capacities at the Office of the Superintendent, including Legal Counsel and Chief of Staff.

Throughout his career with the CPD, Brzeczek conducted and oversaw numerous crime investigations. In 1966, for example, Brzeczek became a Youth Officer where he investigated crimes against children and crimes committed by children, including conducting missing children investigations. While working as a Youth Officer, Brzeczek worked with detectives and investigated some homicides and sex offenses. The CPD training for Youth Officers and other detectives was similar, including the required paperwork that had to be completed, such as arrest and supplementary reports.

In March 1970, the CPD promoted Brzeczek to Sergeant in the Detective Division. As Sergeant in the Detective Division, Brzeczek reported to the Chief of Detectives and supervised personnel, including detectives, desk officers, secretaries, and cadets. Some of Brzeczek's tasks in this position included preparing comparative analyses of reported crimes, inspecting and auditing detective reports and record keeping systems, and investigating homicides. While he served as a Sergeant in the Detective Division, Brzeczek co-authored the Criminal Investigation Division Operation Procedures Manual.

In 1972, the CPD assigned Brzeczek to the Bureau of Inspection Services where he worked for a Deputy Superintendent. In November 1972, the CPD promoted Brzeczek to Lieutenant. After he attended Lieutenant training, Brzeczek returned to the Bureau of Inspection Services where his primary function was to investigate the Internal Affairs Division ("IAD"). In

particular, Brzeczek reviewed IAD investigations for their thoroughness, the propriety of investigation, the investigator's conclusions, and the proposed punishment for the officer.

In 1973, the CPD appointed Brzeczek to the position of Commanding Officer of Gambling in the CPD's Organized Crime Division. During his short tenure in this position, he supervised seven sergeants, approximately thirty detectives, and two undercover police officers.

Thereafter, the CPD promoted Brzeczek to the position of Legal Counsel to the Superintendent. As Legal Counsel, Brzeczek was the general counsel to the police department and his tasks included drafting CPD general orders. Brzeczek also worked as Chief of Staff to the Superintendent of Police in which he wrote press releases and speeches for the Superintendent and attended functions on the Superintendent's behalf. Brzeczek prepared the Superintendent to give testimony before Congress concerning intelligence procedures. Also, Brzeczek prepared the Superintendent's monthly report to the police board. In this position, Brzeczek reviewed every sustained disciplinary investigation against police officers, which averaged 2,500 or more a year.

Brzeczek became the Superintendent of Police on January 11, 1980. As Superintendent, Brzeczek was the Chief Executive Officer of the CPD, which is one of the largest local law enforcement agencies in the United States. Brzeczek tasks as Superintendent involved giving speeches, attending meetings, and supervising individuals in command positions within the department, as well as supervising the department's bureaus. As Superintendent, Brzeczek instituted the policy for the use of General Progress Reports by Chicago police detectives to ensure that all potentially exculpatory materials were properly memorialized. While serving in the position of Superintendent, Brzeczek reported directly to the Mayor of Chicago.

After Brzeczek left the CPD in 1983, he went into the practice of law and still practices

law today. Brzeczek's area of law is primarily criminal defense in which he handles felony cases

investigated by Chicago police detectives. At the *Daubert* hearing, Brzeczek testified that he has

litigated literally hundreds of felony cases involving CPD investigations. Meanwhile, Brzeczek

is a member of the Chicago Bar Association, American Bar Association, International

Association of the Chiefs of Police, the Illinois Police Chiefs Association, and the Police

Executive Research Foundation.

In addition, Brzeczek has taught police procedures at the FBI academy, the National

Executive Institute, the Illinois State Police Academy, the CPD academy, and other police

department academies around the country. He has also taught seminars on the use of deadly

force at Harvard Law University and courses on internal affairs investigations at the University

of Louisville. Further, Brzeczek has been a guest instructor at the John F. Kennedy School of

Government at Harvard University and the University of Chicago Law School. Brzeczek has

published articles in the FBI Law Enforcement Bulletin.

Based on Brzeczek' education, training, extensive practical experience, and overall

knowledge of police procedures, he qualifies as an expert under *Daubert* and Rule 702 to testify

about police practices. *See Gayton v. McCoy,* 593 F.3d 610, 616 (7th Cir. 2010) ("Whether a

witness is qualified as an expert can only be determined by comparing the area in which the

witness has superior knowledge, skill, experience, or education with the subject matter of the

witness's testimony.") (citation omitted); *see also Metavante Corp. v. Emigrant Sav. Bank,* 619

F.3d 748, 761 (7th Cir. 2010) ("An expert's testimony is not unreliable simply because it is

founded on his experience rather than on data"). More specifically, Brzeczek is qualified to

offer opinions regarding the role of a detective at CPD based on his experience of working with detectives, supervising them, and overseeing their work during his tenure at CPD, as well as the fact that he created the general progress report used by CPD detectives at the time in question. *See Smith,* 215 F.3d at 715; *see also Tuf Racing Prods., Inc. v. American Suzuki Motor Corp.,* 223 F.3d 585, 591 (7th Cir. 2000) ("Anyone with relevant expertise enabling him to offer responsible opinion testimony helpful to judge or jury may qualify as an expert witness."). Defendants' arguments to the contrary fail.

## II.     Brzeczek's Opinions

In rendering opinions in this case, Mr. Brzeczek looks at two different time periods – 1) the initial investigation of Kathy Morgan's death in October 1990 and 2) the investigation surrounding the arrests of Hill, Dan Young, and Peter Williams in March 1992.  The Court will address his opinions in both of these time periods.

### A.     Opinions Regarding October 1990

Mr. Brzeczek opines that the CPD detectives initially investigating the Morgan murder made mistakes, including: 1) they failed to "remember that there were two wooden dowels that were removed from the victim's body at the time of the autopsy and that also at the time of autopsy vaginal and rectal swabs were taken from the victim;" 2) one of the detectives failed to mention that he was present at the autopsy in his Supplementary Report; 3) the reports are wrong regarding the details of the wooden dowels; and 4) the detectives "did very little including, but not limited to, taking the fundamental steps to determine the validity of the victim's 'boyfriend's' alibi (her male acquaintance) nor was there any focus or investigative activity based on the RAMIS results."  Defendants argue that Brzeczek's opinions regarding the October

10

1990 investigation are irrelevant because: 1) there is no constitutional right to a full and complete police investigation; 2) the opinions concern events that occurred 17 months before Hill was arrested in March 1992; and 3) the opinions are irrelevant to whether Hill's confession was coerced. The Court agrees.

Plaintiff argues that the opinions regarding the 1990 investigation conducted mostly by non-defendant detectives gave Defendants a motive to coerce a confession from Plaintiff Hill seventeen months later. Plaintiff fails to explain, however, how the specifics of the alleged failings in 1990 created a motive for the defendants in 1992 to coerce a confession from Plaintiff Hill. While Plaintiff may be able to argue that the **status** of the investigation in 1992 gave Defendants a motive to coerce Plaintiff's confession so they could claim they had solved the case, he fails to link the specific deficiencies from 1990 to the actions taken approximately 17 months later. Furthermore, introduction of the deficiencies in the initial investigation into Kathy Morgan's murder will lead to jury confusion given that the focus of this case is on whether the Defendants coerced Plaintiff's confession in 1992, not whether the initial investigation was lacking.

Furthermore, some of Brzeczek's opinions pertain to the RAMIS system. Specifically, he opines that the file did not contain a RAMIS report and "the RAMIS report is of particular significance because it would show who the sex offenders were at the time." (Report at 3.) As Defendants note, however, Brzeczek has no working knowledge of the RAMIS system. His knowledge is limited to "some articles [he] read many years ago when the program first came into existence." (Dep. at 134.) It was not in existence during the course of his career at CPD other than possibly in "its embryonic stage," he has never run a RAMIS report, he did not know

11

what information was necessary to run a RAMIS report and he does not know what a RAMIS report looks like when printed. (Dep. at 135.) As such, he does not have the foundation for these opinions and he cannot apply any reliable methodology to conclude that the detectives failed to employ that system to canvass for potential sex offenders in connection with the Morgan murder investigation.

In addition, Mr. Brzeczek's opinions regarding the wooden dowels are irrelevant to this false confession case. He notes that discrepancies existed between the medical examiner's report and the police report prepared by a detective who is not a party to this lawsuit regarding the location of the wooden dowels. He further agrees, however, that the medical examiners report would have been placed in the murder file for the clarification of any discrepancies. Plaintiff does not even attempt to defend these opinions.

Finally, Mr. Brzeczek opines that the detectives in October 1990 did very little "including, but not limited to, taking the fundamental steps to determine the validity of the victim's boyfriend's alibi." (Report at 2.) He opines that given the nature of the sexual assault on Ms. Morgan that there is "a high probability that she knew the offender or the offender had a prior history of sexual offenses and may be known to the police." (Report at 3.) Plaintiff argues that this opinion is relevant because "it is more likely that Defendants (if they were not fabricating a confession for Plaintiff to regurgitate) would investigate the relationship between Plaintiff and Ms. Morgan[2]." (R. 431-1, at 6-7.) This opinion, however, pertains to the initial

---

[2] As the Court previously has noted, as long as Defendants argue that Hill remains guilty of the Kathy Morgan murder, evidence concerning Hill's innocence is relevant and probative to Hill's coerced confession claims. This ruling does not mean, however, that the parties can retry Hill's criminal case.

investigation that took place at the time of the murder in October 1990. It is not linked to the

acts that took place 17 months later, thus its relevance is minimal, at best. Even if Mr.

Brzeczek's opinions regarding the "true perpetrator" have some relevance, Rule 403 precludes

their admission in this case because such evidence regarding the initial investigation poses the

significant danger of confusing and misleading the jury regarding the issues in this case. This

evidence focuses on the initial investigation and the shoddiness of that investigation, not on the

issues before the Court.

B.      **Brzeczek's Opinions Regarding the Reports and Note Taking Are Admissible**

Brzeczek opines that the Defendants who allegedly coerced the false confessions from

Plaintiff Hill, Williams, and Young failed to comply with standard police protocol by failing to

take notes or to preserve them during their investigation, failing to use the general progress

reports during the interviews, failing to timely submit a supplemental police report, and

neglecting to submit the supplemental reports through the proper channels at CPD. Defendants

challenge the relevancy of these opinions because the Court previously dismissed Plaintiff's

*Brady* claims. *See Hill v. City of Chicago*, No. 06 C 6772, 2009 WL 174994 at *3-4 (N.D. Ill.

Jan. 26, 2009). While Plaintiff's *Brady* claim no longer remains in the lawsuit, these opinions

regarding standard police procedures are relevant to the underlying coerced confession claim.

Defendants did not complete a report of their interrogation of Mr. Williams and his alleged

confession until approximately two months after the interview. Mr. Brzeczek opines that this

late reporting violates the CPD's standard police reporting. The Defendant Detectives failure to

comply with standard police protocols is relevant to whether the Defendant Detectives fabricated

the confession of Mr. Williams rather than simply interviewed him and took notes of his

13

voluntary confession.

In addition, Mr. Brzeczek's opinions that the Detectives failed to properly document the chronological progress of the investigation are relevant to this case. The CPD uses a general progress report ("GPR"), which is "an official form ... which standardizes the note-taking form for Chicago police detectives." (Hearing at 30.) Mr. Brzeczek invited the form in 1982 and it is still used today. He noted that the Defendant detectives did not use a GPR to standardize and memorialize their note-taking during the course of the investigation. Mr. Brzeczek opined that the detectives selectively used the GPRs to memorialize information and conveniently to forbear from memorializing notes during the progress of an investigation when such notes would be disadvantageous to their case objective.

C.     **Brzeczek's Opinions Regarding State of Mind of Defendants Are Inadmissible**

Mr. Brzeczek further opines that detectives were involved in a collective scam to frame Hill, Young, and Williams which began to unravel when they learned that Williams was in jail at the time of the murder. He further opines that the actions of the Defendant detectives were willful and wanton. He also opines: "To charge three men with murder when the detectives knew they had no physical evidence connecting any one of the three men to the murder but obtained scam confessions from each of them so they can represent to the world that they solved the murder of Cathy Morgan is contrary to every fundamental principle of legitimate police practices." (Report at 216). These opinions go way beyond Mr. Brzeczek's expertise. In addition, Mr. Brzeczek has not provided an adequate foundation to opine on the mental state of the Defendants or on any "scam" they agreed to enter. Furthermore, Mr. Brzeczek's legal conclusions regarding these areas are similarly inadmissible.

14

**D.     Brzeczek's "We're Never Wrong Syndrome" Opinion Is Inadmissible**

Brzeczek also opines that Defendants have the "we are never wrong" syndrome because they were confronted with DNA evidence "which exonerates persons wrongfully convicted of a crime," yet still maintain that accused is guilty of the crime.  He opines that they refuse to accept that they were wrong in the case.  Mr. Brzeczek admitted that this "we are never wrong" syndrome is based on his "personal opinion" and not on any scientific research or studies.  (Dep. at 212.)  Significantly, he has not established any foundation to offer such an opinion.  He claims that he has "yet to see anyone come out in law enforcement and say we were wrong."  (Hearing at 62.)  He further claims that he has "heard prosecutors" and "heard police officers" make such comments publicly.  (Dep. at 211.)  This general commentary does not provide a sufficient foundation to give this personal opinion.  Accordingly, this aspect of the motion is granted.

**E.     Opinions Regarding the Reduced Mental Capacity of Hill and Young**

Mr. Brzeczek also opines "Hill and Young were slow and had questionable intellectual comprehension.  Hill had an IQ of 78 and Young had an IQ of 56.  A reasonable and trained police detective would know that people with reduced mental capacity are vulnerable and subject to suggestive manipulation and coercion."  Mr. Brzeczek does not have the foundation to offer this opinion because he is not a mental health expert and he has not met with or observed either Hill or Young, thus he cannot opine that there were "slow" or had "questionable intellectual comprehension."  Indeed, it is undisputed that Mr. Brzeczek has never met with Hill, and he does not know how Hill presented to the detectives who interviewed him in connection with the Morgan murder.  In addition, Plaintiff has not identified any evidence suggesting that the Defendants were aware of Mr. Hill's or Mr. Young's IQ when they questioned them.  As such,

15

he has also failed to link this testimony to the facts of this case.  Accordingly, the Court grants

Defendants' motion to strike it.

## CONCLUSION

For these reasons, the Court grants in part and denies Defendants' motion to bar Richard

J. Brzeczek as an expert witness.

**Dated:**   July 5, 2011

**ENTERED**

**AMY J. ST. EVE**
**United States District Court Judge**